UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TYSON MARTIN,
     Petitioner,

vs.                             Case No.:  4:20cv507/TKW/EMT

SECRETARY DEP'T OF CORR.,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Tyson Martin (Martin) filed a counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 5). Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 10). Martin filed a reply (ECF No. 18).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b). After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Martin is not entitled to habeas relief.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 10).[1]  Martin was charged in the Circuit Court in and for Leon County, Florida, Case No. 2014-CF-2067, with one count of sexual battery when the victim was physically helpless (ECF No. 10-1 at 16 (information)). A jury trial was held on May 10–11, 2016 (*see* ECF No. 10-2 at 245 through 10-4 at 113 (transcript of jury trial)).  At the beginning of trial, the State amended the information to add language charging attempt (ECF No. 10-1 at 17 (amended information)).  The jury found Martin guilty of attempted sexual battery when the victim was physically helpless (ECF No. 10-1 at 45–46 (verdict)).  On August 30, 2016, the court adjudicated Martin guilty and sentenced him as a sexual predator to a "split" sentence of sixty months in prison, with pre-sentence credit of two days, followed by sixty months of probation (ECF No. 10-1 at 136 through 10-2 at 109 (transcript of sentencing); ECF No. 10-1 at 111–19 (judgment and sentence)).

Martin appealed the judgment and sentence to the Florida First District Court of Appeal (First DCA), Case No. 1D16-3953 (ECF No. 10-4 at 168 through ECF No. 10-5 at 43 (parties' briefs)).  The First DCA affirmed the judgment per curiam

---

[1] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

without written opinion on May 30, 2018 (ECF No. 10-5 at 45–46 (opinion)).  *Martin v. State*, 247 So. 3d 422 (Fla. 1st DCA 2018) (Table).  The mandate issued June 20, 2018 (ECF No. 10-5 at 47 (mandate)).

On May 9, 2019, Martin filed a counseled motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 10-5 at 3–19 (Rule 3.850 motion)).  The circuit court summarily denied the Rule 3.850 motion in an order rendered on August 28, 2019 (ECF No. 10-5 at 100–02 (order)).  Martin appealed the decision to the First DCA, Case No. 1D19-3423 (ECF No. 10-5 at 151–182 (Martin's initial brief)).  The First DCA affirmed the circuit court's decision per curiam without written opinion on May 15, 2020 (ECF No. 10-5 at 187–88 (opinion)).  *Martin v. State*, 297 So. 3d 525 (Fla. 1st DCA 2020).  The mandate issued July 15, 2020 (ECF No. 10-5 at 196 (mandate)).

Martin commenced this federal habeas action on October 23, 2020 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United

States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537

U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for

> obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

## III.   MARTIN'S CLAIMS

A.   **"Ground 1:  The state trial court erred by prohibiting the defense from introducing the recording of Sergeant Greg Wilder's interview of Petitioner Martin.  Alternatively, defense counsel rendered ineffective assistance of counsel by failing to appropriately object to the mischaracterization of Petitioner Martin's statement to Investigator Wilder."**

**"Ground 5:  Defense counsel rendered ineffective assistance of counsel by failing to properly preserve the trial court's erroneous**

**denial of the admission of Petitioner Martin's entire statement to Investigator Wilder."[3]**

Martin asserts that during trial, the State presented testimony from Sergeant/Investigator Greg Wilder, who stated he interviewed Martin on July 10, 2014 (*see* ECF No. 5 at 3).  Martin asserts Investigator Wilder testified as follows, in relevant part:

> Q [by the State].  Did you ask him whether he penetrated her vagina?
>
> A.  I did.
>
> Q.  And what was his response?
>
> A.  He said he did not.
>
> Q.  So he denied penetrating her vagina?
>
> A.  That is correct.  Yes, ma'am.
>
> Q.  Okay.  But said [sic] his hands were moving towards that area?
>
> A.  Yes, ma'am.

(ECF No. 5 at 3–4).  Martin asserts defense counsel indicated he intended to publish, during cross-examination of Investigator Wilder, the complete audio/video recording of Investigator Wilder's interview with Martin (*id.* at 4).  Martin asserts

---

[3] For organizational purposes, the court is addressing Martin's federal habeas claims in a different order than he presents them in his amended § 2254 petition.

the trial court ruled that defense counsel could not introduce the entire recording into evidence, but counsel could cross-examine Investigator Wilder about specific statements (*id.*).

Martin asserts Investigator Wilder testified as follows during cross-examination and re-direct examination:

> Q [by defense counsel].  Okay.  And throughout the interview Mr. Martin denied going towards the—to actually penetrate her vagina; is that correct?
>
> A.  Throughout the interview, yes, he—
>
> Q.  He admitted touching her butt?
>
> A  Right.
>
> Q.  He denied doing anything to try to penetrate her vagina?
>
> A.  He denied penetrating her vagina, yes.
>
> Q.  He denied trying to penetrate it?  Did he ever admit to trying to penetrate her vagina?
>
> A  No.  That—that exact verbiage, no.
>
> Q.  Did he ever admit to trying to touch her labia majora or labia minora?
>
> A.  That question was never asked, so—
>
> Q.  Did he ever try to touch her clitoris?
>
> A.  It was never asked.

Q. What about her butthole [sic]?

A. It was never asked specifically.

Q. So you never asked him specifically what he was doing, did you?

A. No, I asked him what he was doing. He indicated to me that his hand was underneath, skin on skin, and that her—he was—he had grabbed her boob, he had grabbed her butt, and his hand was moving down towards her vagina.

Q. Did you ask him if he intended to touch her vagina?

A. No, I did not ask him that.

Q. Did you ask him if he tried to touch her vagina?

A. No, sir.

Q. Did you ask him if he tried to touch her clitoris?

A. No, sir, I did not.

Q. Did you ask him if he tried to touch her labia?

MS. NORRIS [the prosecutor]: Object to asked and answered.

THE COURT: I think you did ask that. Sustained.

MR. ZELMAN [defense counsel]: I did? Just a moment, Your Honor.

(Pause.)

BY MR. ZELMAN:

Q. Investigator Wilder, during your interview with Mr. Martin, did you ask him what he intended to do?

A. I don't recall. I'd have to go back to the—I would have to back to the entire interview, but there were several questions asked there. Your specific questions, I do not recall—I did not ask him those. Overall, I don't know if I asked him that, his overall intention.

Q. Did he make any statements about whether or not he intended to touch—

MS. NORRIS: Are you done with your—

BY MR. ZELMAN:

Q. —her vagina?

MS. NORRIS: I was going to object to hearsay.

THE COURT: Well, overruled on the hearsay. He asked a specific question that relates to what you asked him about, although I think you've already asked him that question. He's already answered no.

BY MR. ZELMAN:

Q. Well, if you refer to page 23, of your—of the transcript, lines 2 and 3.

A Two and 3? Page 23?

Q. Yes. Did he make a statement about whether or not he intended to touch her vagina?

MS. NORRIS: I object to improper—can we go to sidebar?
. . . .

Q.  Investigator Wilder, we'll go back to what we were just discussing.

A.  Yes, sir.

Q.  You testified that you never asked him or he never said what his intentions were.  Is that a fair statement?

A.  What his intentions were?

Q.  Yes.

A.  I don't think that was a direct terminology that I asked.

Q.  You didn't ask him that?

A.  Right, I don't think that was a direct terminology, what I asked.  I don't think I specifically asked, "What were your intentions?"

Q.  Okay.  Did he indicate what his intentions were?

A.  He indicated what were not his intentions.  Does that make sense?

Q.  That being that it was not his intention to touch the vagina?

A.  Yes.  I'm not trying to go around with words, but his statement was it wasn't his—it was not an intention to touch her vagina.

MR. ZELMAN:  Just a moment, Your Honor.

(PAUSE.)

MR. ZELMAN:  Nothing further at this time, Your Honor.

THE COURT:  Okay.  Any redirect from the State?

MS. NORRIS:  Sure.

MR. ZELMAN:  Do you want him to keep the transcript?

MS. NORRIS:  Yes.

## REDIRECT EXAMINATION

BY MS. NORRIS:

Q.  I would like you to direct me to the line and page number where he told you it was not his intention to touch her vagina.

A.  It got cut off.  Page 23, I think it's line 2.

Q.  No.

A.  I'm—

Q.  Pay attention to my question.

A.  Okay.

Q.  Where in this transcript does he say, "It was not my intention to touch her vagina, to penetrate her vagina," to X, Y, Z?

A.  It doesn't, ma'am.

Q.  So it's actually just the phrase, "It was not my intention," and he didn't finish the sentence?

A.  That's correct.

Q.  So more accurately he never said about what he did or did not intend to do?

A.  Yes, ma'am.

(ECF No. 5 at 4–8).

Case No.:  4:20cv507/TKW/EMT

Martin asserts that during the recorded interview, he actually said the following:

> INVESTIGATOR WILDER:  But your hand made it underneath and you were grabbing her butt.
>
> DEFENDANT MARTIN:  Yes, that's right.
>
> INVESTIGATOR WILDER:  And I'll use non-clinical terms: more of the cheek or more of the crack?  Or were you—you said you were moving your hands down toward her vagina, I'm assuming from behind?  Your hand wasn't going down the front of her pants—
>
> DEFENDANT MARTIN:  **I mean, it went towards but it was not an intention to—**
>
> INVESTIGATOR WILDER:  Well, let me ask:  Did you go in the waistband or the short?  Did you go up the leg?
>
> DEFENDANT MARTIN:  In the waistband.  And these are high waisted shorts.

(ECF No. 5 at 8) (emphasis added by Martin).

Martin asserts the State "made the mischaracterization worse" during closing arguments by stating:

> Maybe he didn't intend to hurt her feelings.  Maybe he didn't intend for her to go this far. Maybe he didn't intend—I don't know.  But he didn't say that.

(ECF No. 5 at 13).

Martin contends the trial court deprived him of his constitutional right to a fair trial, guaranteed by the Fifth and Fourteenth Amendments, by preventing him from

publishing the entire recording of Investigator Wilder's interview to the jury (ECF No. 5 at 8, 12; ECF No. 18 at 1–5).  He contends Florida's "rule of completeness" codified at Florida Statutes § 90.108(1), which is based upon "fairness" principles, and Florida state cases interpreting that rule, dictated that the defense be permitted to play the entire recording of the interview (ECF No. 5 at 8–12; ECF No. 18 at 1–5).  Martin contends it was crucial for the defense to present evidence of Martin's lack of intent to penetrate the victim's vagina, because his intent differentiated the lesser included offenses of attempted sexual battery (of which Martin was convicted) and simple battery (*id.*).  Martin contends the jury heard the victim's testimony that he (Martin) digitally penetrated her vagina, but the jury obviously believed his (Martin's) statements to Investigator Wilder, that he did not penetrate her vagina, because the jury did not convict him of sexual battery (*id.*).  Martin contends if the jury had heard his entire conversation with Wilder, the jury would have found that he did not intend to penetrate the victim's vagina and thus would have convicted him of simple battery instead of attempted sexual battery (ECF No. 5 at 10, 13–14; ECF No. 18 at 1–2).

Martin asserts when he attempted to present this claim on direct appeal, the State argued in its answer brief that it was not preserved and that defense counsel should have asked to recross-examine Investigator Wilder (ECF No. 5 at 12).  Martin

asserts that a review of the direct appeal oral argument (available on the First DCA's website) demonstrates that the appellate court agreed with the State's lack-of-preservation argument, specifically, that defense counsel failed to renew the request to publish the recording following the State's redirect (*id.*).  Martin asserts that on this basis, he presented a claim of ineffective assistance of trial counsel (IATC) in his Rule 3.850 motion, claiming that defense counsel rendered ineffective assistance, in violation of the Sixth Amendment, by (1) failing to object to Investigator Wilder's testimony on redirect on the ground that it was misleading and mischaracterized Martin's statement, (2) failing to request to recross-examine Wilder with the recording, (3) failing to object to the State's closing argument as misleading, and (4) failing to preserve, for appellate review, the claim that the recording should be admitted due to Wilder's mischaracterizing Martin's statement during re-direct examination, and that exclusion of the entire recording violated Martin's right to a fair trial (*id.* at 12–13, 28–30).

Martin contends due to the trial court's exclusion of the recording and defense counsel's alleged ineffectiveness, the jury never heard his actual statement to Investigator Wilder, that his hand "went towards" the victim's vagina "but it was not an intention to—" (ECF No. 5 at 12–14).  Martin contends the state courts' adjudications of his "fair trial" and IATC claims were contrary to and unreasonable

applications of clearly established federal law (*id.* at 12, 15, 30).  He additionally contends the state courts' adjudications were based on an unreasonable determination of the facts in light of the evidence in the state court record (*id.*). Martin requests an evidentiary hearing on his IATC claims, on the ground that the state court denied him the opportunity present evidence at an evidentiary hearing (*id.* at 16–17, 30).

The State concedes that Martin exhausted his federal "fair trial" claim and his IATC claims in the state courts (*see* ECF No. 10 at 17, 45).  The State contends the state courts' adjudications of Martin's claims were not contrary to or an unreasonable application of clearly established federal law (*id.* at 17–25, 45–49).

### 1.    Federal Fair Trial Claim

Martin claims that the trial court deprived him of his constitutional right to a fair trial, guaranteed by the Fifth and Fourteenth Amendments, by preventing him from admitting into evidence the entire recording of his conversation with Investigator Wilder.

The transcript of Martin's trial is part of the state court record.  M.W., the victim, testified she was 22 years old at the time of her testimony in May of 2016 (she was 20 years old at the time of the offense) (ECF No. 10-2 at 283 through 10-3 at 52 (M.W.'s trial testimony)).   M.W. testified that on July 2, 2014, she, Taylor

Foster (M.W.'s roommate), Ms. Foster's boyfriend (Andrew Sebesta), and Mr. Sebesta's roommates (Martin and Lacey Marx) went to the "Strip" on Tennessee Street.   M.W. testified she consumed three to four strong vodka drinks.   M.W. testified that at approximately 12:30 a.m. (the morning of July 3), she and the group left the "Strip" and went to Mr. Sebesta's house.   M.W. testified that when she arrived, she got sick in the bathroom and then laid down on the couch in the living room.  M.W. testified she fell asleep on the couch and awoke between 2:30 and 3:00 a.m., when she felt Martin touching her:

> A.  I was woken by—by Tyson Martin's hands down the back of my pants, in my vaginal area, inside my vagina, while I was sleeping.

> Q [by the prosecutor].  Now, you said inside of your vagina?

> A.  Yes.

> Q.  Okay.  Can you—do you know—can you describe what you felt inside of your vagina?  I know that's an awkward question, but what was inside of your vagina?

> A.  Tyson Martin's fingers.

> Q.  Okay.  Were they touching the outside of vagina, or inside of your vagina?

> A.  Inside.

> Q.  Okay.  Were they being still or moving?

> A.  Moving very vigorously.

Q.  Okay.  Would you describe it as—and I'm going to use a lay term—would you describe it as being fingered?

A.  Yes.

Q.  Okay.  Do you know how many fingers he had inside of you?

A.  More than one.

Q.  Can you—and I'm sorry I'm being detailed, but—

A.  That's okay.

Q.  —can you describe how much of the finger he had inside of your vagina?

A.  The full finger, I mean, as far as it would go.  The entire finger.  Fingers.

Q.  So up until the base—

A.  Yes—

Q.  —the palm of the hand?

A.  —up until—up until they wouldn't go any further.

(ECF No. 10-3 at 1–3).  M.W. testified she was wearing a red tank top and high-waisted shorts with no underwear.  She testified Martin's arm was "down the back of me, all the way through my pants, around my buttocks and inside my vagina" (*id.* at 8–9).

M.W. testified she was lying on her left side and woke up and turned around.  She testified that Martin was behind her.  M.W. testified she said, "Are you fucking

kidding me?  Don't touch me.  Leave me alone.  Go away." (ECF No. 10-3 at 3).

M.W. testified she said this "very sternly," and although she would not characterize

it as screaming, she "did get my point across" (*id.*).  M.W. testified that Martin said,

"You weren't supposed to wake up" and then backed up (*id.*).  She testified she laid

there "kind of frozen" and eventually went back to sleep (*id.* at 9).

M.W. testified she awoke again at 7:00–7:15 that morning "in a panic" (ECF

No. 10-3 at 9).  She testified, "I thought—I hoped it was a nightmare, and then I

realized that that really happened to me, and I got real scared." (*id.* at 9–10).  M.W.

testified she found Taylor (her roommate) in a back bedroom and pulled her into the

hallway.  M.W. testified that she told Taylor what happened, that she did not feel

safe or comfortable, and that she wanted to go home.  M.W. testified she and Taylor

left and went home, and she laid in bed and cried in the fetal position until she went

to work at Jimmy John's later that day.  M.W. testified her boss sent her home after

an hour because he could tell she was clearly upset.  M.W. testified she reported the

event to law enforcement four days later, on Monday, July 7, 2014.  M.W. testified

she reported it because "Something had to be done.  If he would do it to me, he would

do it to someone else." (*id.* at 11).  With respect to her interaction with Martin earlier

that evening, M.W. testified they introduced themselves, but she did not talk to him,

flirt with him, or dance with him.

On cross-examination, M.W. testified she did not recall sending Lacey Marx (one of Martin's roommates) a Facebook friend request on July 3 (after she and Taylor left the house) or "tagging" Marx in a photograph taken the night before (ECF No. 10-3 at 22–23). M.W. testified she spent July 4, 2014 (the day after the incident) celebrating with friends (*id.* at 36). She testified she, her boyfriend Jason, and Taylor Foster went to a fraternity house in Heritage Grove during the day and then went to the "Strip" (*id.* at 36–37). M.W. testified she was drinking but not excessively (*id.*).

Kenneth Pinkard, an officer with the Tallahassee Police Department (TPD) testified that M.W. reported a sexual battery on July 7, 2014 (*see* ECF No. 10-3 at 58–63 (Pinkard's trial testimony)). Officer Pinkard testified he took a written statement from M.W. He testified he also collected a bra, shirt, and pair of shorts from M.W.

Taylor Foster's description of the events on the night of July 2 and early morning of July 3 were largely consistent with M.W.'s testimony (*see* ECF No. 10-3 at 65–90 (Foster's trial testimony)). Foster testified M.W. began drinking at the "Strip" and got sick in the bathroom of Andrew's house afterwards. Foster testified Andrew carried M.W. from the bathroom to the living room and laid her on the couch. Foster testified she and Andrew went to one of the bedrooms shortly thereafter, and M.W. was asleep at that time. Foster testified she heard other people

talking in the common/living room area but did not know who it was. Foster testified she woke up the next morning at 6:30 or 7:00 to M.W. knocking on the bedroom door. Foster testified M.W. was crying hysterically. Foster testified Andrew drove them to where M.W. had left her car, then she and M.W. drove home and went to work at Jimmy John's later that day.

On cross-examination, Ms. Foster testified that on July 4, 2014, she, M.W., and M.W.'s boyfriend went to "a bunch" of parties at Heritage Grove apartments during the day and then went to the "Strip" that night (ECF No. 10-3 at 83–87). Ms. Foster testified she and M.W. were drinking all day and were drunk that night (*id.* at 86–87).

Andrew Sebesta testified, in relevant part, that he moved M.W. from the bathroom to the couch (*see* ECF No. 10-3 at 91–112 (Sebesta's trial testimony)). Sebesta testified that everyone else, including Martin, was in the living room when he put M.W. on the couch. Sebesta testified that M.W. was "pretty much asleep, but every once in a while she would, like, butt into the conversation and then go back to not being with us" (*id.* at 98). Sebesta testified that Martin was one of the people who was still in the living room when he (Sebesta) and Taylor Foster went to bed. Sebesta testified that the next morning, he drove Taylor and M.W. to M.W.'s car,

and M.W. was crying.  Contrary to M.W.'s and Foster's testimony, Sebesta testified that M.W. was drinking prior to when they went to the "Strip."

Brittany Auclair a Crime Laboratory Analyst in the Biology Section of the Florida Department of Law Enforcement, testified she performed DNA testing on certain areas of the bra, shirt, and shorts collected by the TPD (*see* ECF No. 10-3 at 113–47 (Auclair's trial testimony)).  Auclair testified she did not locate any semen or blood on those clothing items.  Auclair testified she also tested for "touch DNA" by turning the shorts inside out and swabbing from the top, sides, and down toward the crotch area (*id.* at 126–27).  Auclair testified she "quantitated" the sample twice (*id.* at 129).  Auclair testified the first time, there was no male DNA present, and the second time there was "a very, very low amount" such that she was unable to compare it to Martin's DNA (*id.* at 129–30).  Auclair testified that if someone put a hand down the back of the shorts, and then the wearer of the shorts continued to wear them, the wearer's DNA could dislodge any DNA cells that may have been present from the person who put a hand down the shorts.

Investigator Greg Wilder testified next.  Investigator Wilder testified he interviewed Martin at the Tallahassee Police Department on July 10, 2014 (ECF No. 10-3 at 152–53).  Investigator Wilder testified that Martin initially stated he could not remember many of the events on the night in question because he was

intoxicated, but after Wilder "confronted him with the concept of DNA evidence," Martin's story changed (*id.* at 157–59). Wilder testified that Martin admitted he touched the victim "in an inappropriate way" (*id.* at 159). Wilder testified he asked Martin where he touched the victim, and Martin responded that he touched "her boob or boobs and her butt" (*id.*).

At some points during the prosecutor's direct examination, Investigator Wilder testified that Martin said certain things, but Wilder could not recall Martin's exact words. During those occasions, the prosecutor used the written transcript of the interview to refresh Wilder's recollection. For example:

> Q. Did he [Martin] tell you whether he had any beliefs that night as to whether or not she was intoxicated?
>
> A. Yes, ma'am.
>
> Q. What did he say he believed about that?
>
> A. I don't have the exact quotes memorized, but there was indications. There were quotes specifically in our interview that he stated that.
>
> Q. Would it refresh your memory if I showed you a transcript from that interview?
>
> A. Yes, ma'am.
>
> MS. NORRIS: May I approach, Your Honor?
>
> THE COURT: Yes.

MS. NORRIS:   For defense counsel, I'm on page 20, lines 6 through 8.

BY MS. NORRIS:

Q.  And if you could just read this silently to yourself.

A.  Okay.

Q.  And does that refresh your memory?

A.  Yes, ma'am.

Q.  Did he indicate to you in the interview that he knew her frame of mind at that time that he was touching her?

A.  Yes, ma'am.

Q.  And what was that?

A.  She was out.  She was out.  She was out of it.  She wasn't there.  She was completely passed out.

(ECF No. 10-3 at 160–61).

Direct examination continued:

Q.  Did he describe how he touched her butt?

A.  Yes, ma'am.

Q.  Under the clothes?  How?

A.  He reached in from—he described reaching in at the waistline of the rear of her clothes and taking his hand and putting it down the back of her shorts, downward from the waistline along her butt.

Q.  Did he say what direction he was heading when he put his arm down the top of her waistband, down towards her butt?

A  He indicated he was headed down there.

Q.  Down where?

A.  Towards her vagina.

Q.  Did you ask him whether he penetrated her vagina?

A.  I did.

Q.  And what was his response?

A.  He said he did not.

Q.  So he denied penetrating her vagina?

A.  That is correct.  Yes, ma'am.

Q.  Okay.  But said his hands were moving towards that area?

A.  Yes, ma'am.

Q.  Did he tell you what happened at that point?

A.  Yes, ma'am, he did.

Q.  What was that?

A.  He stated that as his hand was down her pants, she woke up, and the victim confronted him verbally.

(ECF No. 10-3 at 162–63).

The prosecutor asked Investigator Wilder if Martin said anything about knowing what he was doing was wrong or about any feelings about what he was doing at the time (ECF No. 10-3 at 163). Wilder responded that he did not want to misquote Martin, so the State again refreshed Wilder's recollection with the transcript of the interview (*id.* at 163–64). Wilder then testified that Martin indicated he was inebriated and made a bad decision, and that he was "fucked up" (*id.* at 164).

The prosecutor wrapped up direct examination with a few more questions, and then the court took a short recess before defense counsel's cross-examination of Investigator Wilder (ECF No. 10-3 at 164–65). Outside the presence of the jury, defense counsel announced his intent to introduce the entire audio/video recording of Wilder's interview with Martin (ECF No. 10-3 at 165–66). The court and counsel discussed the issue as follows:

> MR. ZELMAN: I believe that the case law is pretty clear that contemporaneously with the admission of any testimony concerning a portion of the Defendant's statement, the rest of it should be contemporaneously disclosed to the jury.

> THE COURT: Not necessarily. If there's something that's misleading in the testimony that's given, you certainly have a right in fairness to show the rest of the document that would clarify it. But you don't get to just play everything that he said, because that's hearsay when—from your side not—there's an exception on the other side because it's a party opponent. So is there something that's—that you have specifically that's going to be misleading the jury from what's been asked about what was said?

MR. ZELMAN:   Well, I think that the misleading portion specifically is the fact that the implication of the direct statement of Investigator Wilder was that Mr. Tyson—or Mr. Martin stated that he was moving toward her vagina, the implication being that he was going to try and touch it.  I think that the entire video reveals otherwise.  And the rule of completeness—

THE COURT:  If you have where—well, like I said, rule of completeness is, this is going to be misleading unless you consider something else that goes with it in context.  So if you've got something specific that was asked and something that was said that puts that in context, that's certainly fair.  But you don't just get to say I'm going to play the whole video because, you know, there's—I disagree with your characterization of what he said.  You can cross examine.  That's what cross examination is all about.  Didn't he say this?  And where did he say that?  And you've got the transcripts, apparently.

MR. ZELMAN:  Yes, Your Honor.  In *Swearingen versus State*, 91 So. 3d 885, the court states pursuant to the rule of completeness all portions of the defendant's statements should be provided contemporaneously to the jury and not just those that benefit the State.  I think that clearly—

THE COURT:  I would like to see the context of *Swearingen* because I'm pretty sure things that are just good for the defense that have nothing to do with what was offered by the State would not be proper.  So have you got a copy of that for me?

MS. NORRIS:  And, Your Honor, if I could put something into the record.
. . . .
. . . I have no intent of mischaracterizing the Defendant's statement, I do not want to do that, or mislead the jury.  But the question during the interview by the investigator was on page 21, lines 21 through 24.

"Question:  Did your fingers ever make it to her vagina?"

"Answer: No, they didn't. They moved towards that area, but no."

I think, of course, the defense can cross examine the investigator that he doesn't know what the Defendant's intent was, he doesn't know what his plan was, if he moved close towards her vagina.

But I don't believe I've taken anything out of context. I've put into evidence the fact that he denied ever touching her vagina, which is the inculpatory—I'm sorry, exculpatory statement of the Defendant.

And it is my position that I agree with the court, they don't get to wholesale put in the entire interview. If there is a portion I misled, that would be admissible.

MR. ZELMAN: Your Honor, I would also refer to *Metz versus State*, 59 So. 3d 1225. The Defendant's exculpatory out-of-court statement is admissible into evidence when a State witness has testified to incriminating statements contemporaneously made by the Defendant, and the jury should hear the remaining portions at the same time so as to avoid the potential for creating misleading impressions by taking statements out of context.

THE COURT: All right. And I don't have that case, but I have the one you gave me that's just as I cited. The purpose of the rule is to avoid the potential for creating misleading impressions by taking statements out of context. The proper standard for determining the admissibility of testimony under the rule is whether in the interest of fairness the remaining portions of the statement should have been contemporaneously provided to the jury.

And they quote another case which has a similar quote. So if there's a potential for creating, as I said, a misleading impression, you can certainly ask him any questions you want to clarify that. But you don't get to just get to say we're just going to play the statement. I don't know what's in the statement. I haven't heard it. There may be some stuff that is relevant, may not be relevant, but it's going to be an objection to hearsay.

But you certainly, if—if it's unfair, if the jury has been misled by any questions and answers, you can correct that with any reference to the transcript of his statement that you have.

MR. ZELMAN:  Judge, I respectfully disagree.  I think—and as I was citing to *Metz*, it refers to *Ramirez versus State*, which is a Florida Supreme Court case, 739 So. 2d 568.  Fairness is clearly the focus of the rule.  Thus when a party introduces part of a statement, confession, or admission, the opposing party is ordinarily entitled to bring out the remainder of the statement.

THE COURT:  Well, that's the language—you say that, but only if that's going to clear up and clarify in context.  If you've got something in that statement that you want him to tell the jury about, I'm perfectly okay with that.

But I don't think that rule, the ruling of the case law in this area says if you ask a person about what somebody said, and that statement happens to be recorded by the way, she didn't play any of the statement.  All she did was ask this person who happened to be there at the time what did he say, and he answered questions to it.  So we don't even have a situation in which the State has played a portion of a statement.  They've asked—

MR. ZELMAN:  No, but they have quoted from the transcript, and the best evidence of the statement is going to be the recording.

THE COURT:  If you wanted to object to it, you could.

MS. NORRIS:  I think that a personal witness can also be the best evidence.  I don't think the best evidence rules applies to that.

THE COURT:  The best evidence only is—only applies if he says, "I've listened to that tape recorded statement and here is what it says on it."  That's not a best evidence thing.  There's nothing—just because it's recorded doesn't mean the State can't call a witness, as they

are doing, when there may or may not be a lot of stuff in there that the State doesn't want to get into.

MR. ZELMAN:  Judge, I would like to proffer the entire recording into—into evidence then.

THE COURT:  You can.  Certainly, you can put it into evidence, but I'm giving you the opportunity to tell me what parts of the statement that you want to use or you want to play that is going to clarify something or take away what you feel to be a misimpression of the jury.

MR. ZELMAN:  And, Judge, **I don't want to concede that we are not entitled to introduce the entire statement.  I believe that the case law is clear that we are entitled contemporaneously to introduce the entire statement as a matter of fairness because only a portion of it was referenced in the direct—in the direct testimony of this witness.**  So I—

THE COURT:  Well, like I said, is there something specifically, though, that—in other words, if you told me that everything else that's on that statement is necessary so as to be fair—that's the whole idea of the rule, so the jury is not misled and given a false impression—I'm open to it.  But you're just telling me I want to read the whole thing, and I'm entitled do it because it was a statement given contemporaneously with questions that have been asked about it.

MS. NORRIS:  And I would note that, I mean, the Defendant's reading of the case law, I think the rule of completeness is clear, as the Court is saying, it is only to allow the remainder of the Defendant's statements have been made out of context, when the jury is being misled about what was really said because it's been cherrypicked through the statement.  And if we were to read the case law in that way, it would obliterate an admission by a party opponent. Then at any time we elicited any statement of a defendant, every single self-serving thing that he said would then be admissible, so long as we don't take it out of context.

Had I introduced those statements and not elicited that he denied penetration, I do think it would be unfair and out of context, and they would be able to say, but didn't he deny penetrating her? Which is why I put it, in fairness, that he did deny that.

But I think he can be crossed examined on, you don't know what his intent was, you don't know if he intended to put his fingers in the vagina. All you know is he said he was headed in that direction. But even if we were to play the whole video, you'll never—I mean, he can ask him, he told you he didn't plan on penetrating her vagina, maybe he did say that. I don't know if he said that or not, but—

THE COURT: Okay. so you haven't pointed out anything specific; but if you want to make that a part of the record, you certainly can do it.

MR. ZELMAN: Well, and, yes, Your Honor. Specifically, I mean, something that was misleading in Investigator Wilder's testimony, when he was referencing, or when the State refreshed his memory about certain things that were in the record concerning how he felt concerning my client, the specific quote was, "Honestly, I made a bad decision. I made a very bad decision."

Then the next page, "I was inebriated and I was fucked up, and I made a very bad decision." Investigator Wilder juxtaposed those two. He said, "I was inebriated. I made a very bad decision, and I fucked up."[4] He switched them. I think that it's important to realize the best evidence and—of the entire statement is what the statement is, not somebody's memory of what the statement was.

THE COURT: Well, that's your choice to ask him if you want to.

---

[4] Defense counsel misquoted Investigator Wilder's testimony. Investigator Wilder did not testify that Martin stated he "fucked up"; rather, Wilder testified that Martin stated he "was fucked up" (ECF No. 10-3 at 64).

MR. ZELMAN: Well, certainly I'm going to, Judge. But I think that, you know—

THE COURT: Do you have a transcript of that? You can ask him to refresh his memory, or you can impeach him if he—if he maintains it's something different than what you say.

What you're saying, though, to me, just—just from analysis is not any significance of any difference in terms of reversing it. That's what he said, that's what he said. You can ask him, well, didn't you first say this and then say that, if you think it's significant. But I just— my personal thing is I don't think it is.

But, anyway, I'm not going to let you just play the tape, not going to happen.

MR. ZELMAN: I would like to proffer it into the record to preserve it for appeal.

THE COURT: Very good.

. . . .

I'm just saying what I understand the law to be, and you don't get to play it just because you want to play it.

MR. ZELMAN: Well, I don't disagree with the court's statement there. Now, in fairness, over a month ago I e-mailed the State with portions of the recording that we intended to redact. They never responded one way or another whether or not they had any objections to that, so, certainly, it's my position that they are objecting now, it's kind of playing a game of "gotcha." So—

THE COURT: Well, whatever you perceive it to be. I can only rule when I get objections, that's the only way I know how to do it. I can't go behind either—either of your motives when you object.

MS. NORRIS: Right. I did inquire as to how he was going to put that into evidence because it was hearsay. I didn't mean to play "gotcha."

(ECF No. 10-3 at 166–75) (emphasis added).    The audio/video recording was marked as Defense Exhibit 44 and entered into the record (*id.* at 176).

Defense counsel cross-examined Investigator Wilder as follows, in relevant part:

> Q.   And throughout the interview Mr. Martin denied going towards the—to actually penetrate her vagina; is that correct?
>
> A.   Throughout the interview, yes, he—
>
> Q.   He admitted touching her butt?
>
> A.   Right.
>
> Q.   He denied doing anything to try to penetrate her vagina?
>
> A.   He denied penetrating her vagina, yes.
>
> Q.   He denied trying to penetrate it?  Did he ever admitted [sic] to trying to penetrate her vagina?
>
> A.   No.  That—that exact verbiage, no.
> . . . .
> Q.   So you never asked him specifically what he was doing, did you?
>
> A.   No, I asked him what he was doing.  He indicated to me that his hand was underneath, skin on skin, and that her—he was—he had grabbed her boob, he had grabbed her butt, and his hand was moving down towards her vagina.
>
> Q.   Did you ask him if he intended to touch her vagina?
>
> A.   No, I did not ask him that.

Q.  Did you ask him if he tried to touch her vagina?

A.  No, sir.

. . . .

Q.  Did he make any statements about whether or not he intended to touch—

. . . .

—her vagina?

MS. NORRIS:  I was going to object to hearsay.

THE COURT:  Well, overruled on the hearsay.  He asked a specific question that relates to what you asked him about, although I think you've already asked him that question.  He's already answered no.

BY MR. ZELMAN:

Q.  Well, if you refer to page 23, of your—of the transcript, lines 2 and 3.

A.  Two and 3?  Page 23?

Q.  Yes.  Did he make a statement about whether or not he intended to touch her vagina?

MS. NORRIS:  I object to improper—can we go sidebar?

THE COURT:  Is it—is it something separate than no?  Because he said no when you first asked him the question.

MR. ZELMAN:  Well, he said he didn't—

THE COURT:  Do you want to clarify it?

MR. ZELMAN:  Yes.

THE COURT:  Ask him again.

MS. NORRIS:  Your Honor, may go sidebar?

THE COURT:  Sure.

(Sidebar conference as follows:)

MS. NORRIS:  I thought it might be easier if the Court knows what we are referring to.  The investigator said, "You were moving your hands down toward her vagina, I am assuming from behind, question mark?  Your hand wasn't going down the front of her pants?"  And he said, "I mean, it went towards, but it was not an intention to," and then he was cut off.  So I don't think it's out of context because I don't know what he did not intend to do.  I don't know if he didn't intend to smack it, if he didn't intend to penetrate it, if he didn't—I don't think it's—

THE COURT:  Maybe.

MS. NORRIS:  —out of context because—

THE COURT:  I think it is legitimate clarified [sic], but my memory, and I may be wrong, I thought you asked him did he—did you ask him about him intending to—

MR. ZELMAN:  I think the question was:  Did you know what his intent was, or did he tell you?  And he said no, but—

THE COURT:  I think you also asked him did you ask him if that was his intent, and he said that it never came up or something like that.

MR. ZELMAN:  That's different from what he said here, so—

MS. NORRIS:  Actually, if I could—the question that he just asked that I objected to was, "Did you ask him if he intended to penetrate her vagina?"  He never asked him if he intended to penetrate her vagina.  All he said was—

THE COURT:  That's what I thought he said before.  That's what he said, "I didn't ask him."  He went through several body parts, and he said, "I didn't ask him."

MS. NORRIS:  I think maybe the proper objection would be improper impeachment because it's the Defendant's statement of it went towards it, but it was not an intention to—we don't know what the rest of that is.  I don't know what he was trying to say it was not his intention to do.  He didn't—it's not specifically in reference to penetrating her vagina.  I think it's unfair to make the assumption or the leap when I can't cross examine the Defendant about what his intention—

THE COURT:  The only question right now is:  Did you ask him if it was his intent to touch her vagina?  I think he's already answered that question.

MR. ZELMAN:  Okay.

THE COURT:  But in the interest of clarifying it, if you want to ask him, he can say it.  He may waffle a bit because he either maybe—remembers or he doesn't remember, if you want to refresh his memory about that.  But that's a little different than did he admit doing it.

MR. ZELMAN:  You're right.

MS. NORRIS:  I just want to be clear about what, you know, was said because he doesn't say, "I did not intend to penetrate her vagina," he never said that from the transcript.

THE COURT:  Well, the question is:  Did you ask him:  If he didn't ask him—

MS. NORRIS:  Right.  Okay.  Okay.

THE COURT:  If he did ask him, what was his answer?

MS. NORRIS:  Right.  Okay.

(The sidebar conference concluded, and the following took place in open court:)

BY MR. ZELMAN:

Q.  Investigator Wilder, we'll go back to what we were just discussing.

A.  Yes, sir.

Q.  You testified that you never asked him or he never said what his intentions were.  Is that a fair statement?

A.  What his intentions were?

Q.  Yes.

A.  I don't think that was a direct terminology that I asked.

Q.  You didn't ask him that?

A.  Right.  I don't think that was a direct terminology, what I asked.  I don't think I specifically asked, "what were your intentions?"

Q.  Okay.  Did he indicate what his intentions were?

A.  He indicated what were not his intentions.  Does that make sense?

Q.  That being it was not in his intention to touch the vagina?

A.  Yes.  I'm not trying to go around with words, but his statement was it wasn't his—it was not an intention to touch her vagina.

(ECF No. 10-3 at 187–94).  That concluded the cross-examination.

The State conducted re-direct examination as follows, in relevant part:



Q.  I would like you to direct me to the line and page number where he told you it was not his intention to touch her vagina.

A.  It got cut off.  Page 23, I think it's line 2.

Q.  No.

A.  I'm—

Q.  Pay attention to my question.

A.  Okay.

Q.  Where in this transcript does he say, "It was not my intention to touch her vagina, to penetrate her vagina," to X, Y, Z?

A.  It doesn't, ma'am.

Q.  So it's actually just the phrase, "It was not my intention," and he didn't finish the sentence?

A.  That's correct.

Q.  So more accurately he never said about what he did or did not intend to do?

A.  Yes, ma'am.

. . . .

Q.  Okay.  With respect to Mr. Martin's intentions—well, when you were asking him about the direction his hand was moving in, did you use the term "vaginal area" or "vagina"?  And if you need to refer to page 21, lines 21 through 24.  And I'm going to ask the question again now that you're there.

A.  Okay.

> Q.  When you asked him about where his fingers were traveling, did you ask him—did you use the phrase towards her "vaginal area" or her "vagina"?
>
> A.  Vagina.
>
> Q.  Was your specific question:  Did your fingers ever make it to her vagina?
>
> A.  Yes, ma'am, that was my question.
>
> Q.  And what was his exact response?
>
> A.  "No, they didn't.  They moved toward the area but no."

(ECF No. 10-3 at 193–96).

The defense presented testimony from three of Martin's roommates.  Lacey Marx testified she received a Facebook friend request from M.W. on July 3, 2014, and that M.W. "tagged" her in a picture taken the night before (*see* ECF No. 10-3 at 205–36 (Marx's trial testimony)).  Marx also testified that sound traveled in the house, and she could frequently hear people in other parts of the house talking in a regular voice.  Marx testified she went to bed at approximately 1:15 a.m. on July 3. She testified she did not recall the TV being on and was not awoken by the TV or anyone speaking loudly in the living room after she went to bed.

John Searcy testified that the TV was on during the entire time that the group was at the house after returning from the "Strip" (*see* ECF No. 10-3 at 236–62 (Searcy's trial testimony)).  Searcy testified he and Martin watched TV in the living

room while M.W. was sleeping on the couch.  He testified he went to bed in one of the bedrooms at approximately 2:30–3:00 a.m.  Searcy testified he did not hear anything after he went to bed, but he acknowledged he always slept with earphones.

Martin's sister, Blair, testified she went to bed shortly after Andrew Sebasta put M.W. on the couch (*see* ECF No. 10-3 at 265–96 (Blair Martin's trial testimony)).  Ms. Martin testified that the walls in the house were "thin," and she had previously been awoken by voices in the living room (*id.* at 275–76).  Ms. Martin testified that during the early morning hours of July 3, she did not hear any loud voices coming from the living room.  She testified she saw M.W. the following morning, and M.W. looked "really hungover" but she did not appear hysterical or like she had been crying (*id.* at 278–79, 296).

The prosecutor and defense counsel referenced Investigator Wilder's interview with Martin during their closing arguments.  In the first half of her closing argument, the prosecutor argued, "He admits to putting his hand down the back of her pants and going toward her vagina."  (ECF No. 10-4 at 45).

Defense counsel argued:

> He [Investigator Wilder] told you he didn't ask Tyson if Tyson intended to touch M's vagina.  He told you that Tyson denied intending to do that.

He didn't ask Tyson if Tyson tried to touch Ms. W's vagina. He didn't ask Tyson if Tyson tried to touch her clitoris or her labia, or if he intended to penetrate her vagina. He didn't ask any of those questions.

He did tell us on cross examination that Tyson stated he didn't intend on touching Ms. W's vagina. He did tell us that Tyson denied penetrating her vagina. He did tell us that Tyson denied touching her vaginal area.

. . . .

If his intent was to touch her vagina or penetrate her vagina, why would he come from the top? These are high-waisted shorts, so the furthest distance from her vagina is the way in which he entered her shorts.

How does that establish his intent to touch her vagina, to penetrate her vagina? It doesn't.

. . . .

Investigator Wilder did not help the State meet their burden. I would submit to you that Investigator Wilder in his testimony established reasonable doubt concerning the most significant element that the State brought to your attention of the crime charged.

His failure to ask the specific questions, by itself, could establish reasonable doubt that Tyson Martin put his finger—committed an act upon MW in which his finger penetrated M's vagina. He did not ask that question.

More significantly, he didn't ask whether that was what Tyson intended to do or was trying to do. I would submit to you that the two lesser-includeds that are attempts, Investigator Wilder's failure to ask those questions establish beyond a reasonable doubt that Tyson Martin did not attempt to commit a sexual battery, not the reverse, but that his failure to ask those questions mean, and I submit to you that it means that he is not guilty of both versions of the attempted sexual battery. Why? Because there is no evidence to support that finding beyond and to the exclusion of every reasonable doubt.

. . . .

As we said earlier, if Tyson's intent was to touch her vagina, to penetrate her vagina in any way, shape, or form while she was laying [sic] on her side, he would go from the bottom, right where her crotch was.

We'll concede that Ms. W was passed out in the early morning hours of July 3rd. I think all the evidence corroborates that. We'll concede that Tyson admitted to touching her breast and grabbing her butt.

I would submit to you, her own testimony tells us where the rest of the story came from. After she woke up, confronted him for touching her butt, she fell back asleep and had a nightmare. The rest of what happened was a nightmare. It did not happen.

As a result, we ask that you return a verdict of not guilty to Sexual Battery Physically Helpless, Sexual Battery, Attempted Sexual Battery Physically Helpless, Attempted Sexual Battery. The only thing that Mr. Martin did was commit a battery.

(ECF No. 10-4 at 68–71, 87–88).

In the second half of her closing argument, the prosecutor argued the following, in relevant part:

I don't know what he intends. I know what he does. I know what his actions are, and I get to put two and two together.

We have a beautiful girl on a couch, who is sitting there with her, you know, shorts, sitting there. He sees her. He puts his arm down her, and starts going towards her vagina.

According to her, he does goes [sic] in her vagina. You rely on your memory of what the witnesses said, but I have to argue from my memory, that's all I've got, unfortunately.

But Investigator Wilder—he never said he did not intend to touch her vagina. When he had his memory refreshed with the transcript of the interview, he said he didn't—he said, "I never intended," dot, dot, dot.  Didn't say what it was he didn't intend.  Maybe he didn't intend to hurt her feelings.  Maybe he didn't intend for her to go this far.  Maybe he didn't intend—I don't know.  But he didn't say that.

And, in fact, what he did say, when I asked Investigator Wilder, the direct quote was:  Did your fingers ever make it to her vagina?  No, they didn't.  They moved towards that area, but no.

What do you think he was going to do when he got down there, if he didn't?  But I'm arguing to you that he did penetrate her vagina.

(ECF No. 10-4 at 99–101).

After trial, defense counsel filed a motion for new trial asserting, as Ground 1, that the trial court violated Florida's rule of completeness by not allowing the defense to introduce the complete recording of Investigator Wilder's interview of Martin (ECF No. 10-1 at 47–49).  Defense counsel argued that the recording would have been able to clarify whether Martin finished the sentence, "I mean, it went towards but it was not an intention to—" (*id.* at 49).  Defense counsel argued that the trial court's violation of the rule of completeness was a reversible error, and a new trial was the only remedy that would allow Martin to "raise a fair defense" (*id.* at 49).  Defense counsel attached a written transcript of the entire interview (*id.* at 58–78).  The trial court denied the motion for new trial without stating reasons (*id.* at 79).

Martin presented his federal fair trial claim to the First DCA on direct appeal, arguing that the trial court's evidentiary ruling denied Martin's right to a fair trial guaranteed by the Fifth and Fourteenth Amendments (ECF No. 10-4 at 185–96). This was the first time that Martin alerted the state court to the federal nature of his claim. The First DCA affirmed Martin's judgment and sentence without written opinion. *See Martin v. State*, 247 So. 3d 422 (Fla. 1st DCA 2018).

Section 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *See Richter*, 562 U.S. at 99. When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits. *Id.* "That presumption stands unless rebutted by evidence from the state court's decision and the record in the case that leads very clearly to the conclusion that the federal claim was inadvertently overlooked in state court." *Pittman v. Sec'y, Fla. Dep't. of Corr.*, 871 F.3d 1231, 1245 (11th Cir. 2017) (internal quotation marks and citation omitted)).

Here, Martin has not rebutted the presumption that the First DCA adjudicated the merits of his federal fair trial claim.[5]  Therefore, § 2254(d) applies to the First DCA's decision.  *See Richter*, 562 U.S. at 100; *see also Shelton v. Sec'y, Dep't of Corr.*, 691 F.3d 1348, 1353 (11th Cir. 2012) (where state appellate court did not apply a procedural bar, the federal habeas court is compelled to presume that the court's one-word per curiam affirmance was an "adjudication on the merits" entitled to AEDPA deference).

Where, as here, a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision.  *See Richter*, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See id.* at 102.

---

[5] Martin asserts that a review of the direct appeal oral argument, which is available on the First DCA's website, demonstrates that the panel agreed with the State's argument that defense counsel failed to preserve the claim (and specifically, failed to renew the request to play the recording following the prosecutor's redirect-examination of Investigator Wilder) (*see* ECF No. 5 at 12). The court has reviewed the oral argument and concludes that it does not rebut the presumption that the First DCA adjudicated Martin's federal fair trial claim on the merits.  Indeed, in a case cited by Martin in Ground 5 of his § 2254 petition, the First DCA noted that a per curiam affirmance without an opinion in a direct appeal, which is what the First DCA did here, does not establish whether the specific issue was or was not preserved for appeal or whether it was denied on the merits.  *See Tidwell v. State*, 844 So. 2d 701, 703 (Fla. 1st DCA 2003).

Martin contends the trial court's prohibiting the defense from introducing the complete recording of Investigator Wilder's interview of him was contrary to and an unreasonable application of his rights under the Fifth and Fourteenth Amendments (*see* ECF No. 5 at 12). Martin additionally argues that the state court's rejection of his claim was based on an unreasonable determination of the facts in light of the evidence in the state court record (*id.*).

As an initial matter, Martin has not identified an allegedly unreasonable **factual** reason for the state court's rejection of his federal fair trial claim. Instead, his argument under § 2254(d)(2)—that the state court made an unreasonable determination of the facts by prohibiting the defense from introducing the entire recording of the interview—is entirely derivative of his **legal** challenge. Therefore, the court will analyze Martin's argument under § 2254(d)(1) and determine whether the state court's adjudication of his federal fair trial claim was contrary to or an unreasonable application of clearly established federal law.

Martin has not identified any case, and this court has not found one, in which the Supreme Court held that a defendant was deprived of a constitutionally fair trial in circumstances such as these, i.e., where the trial court did not prevent the defense from introducing **portions** of the defendant's out-of-court statement, in order to clarify or provide context to other portions of the statement introduced by the

prosecution, but the court prohibited the defense from introducing the defendant's **entire** statement.

What Martin's argument comes down to is that the trial court incorrectly applied a state evidentiary rule, i.e., Florida's rule of completeness, and that the evidentiary ruling deprived him of a fair trial. Federal courts will not generally review state trial courts' evidentiary determinations. *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014) (citing *Lisenba v. California*, 314 U.S. 219, 228 (1941) ("We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence."). Indeed, in a habeas corpus action brought by a state prisoner, the federal court's authority is "severely restricted" in the review of state evidentiary rulings. *Taylor*, 760 F.3d at 1295 (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Habeas relief is warranted only when the error "so infused the trial with unfairness as to deny due process of law." *Lisenba*, 314 U.S. at 228; *see Estelle*, 502 U.S. at 75 (holding that habeas relief was not warranted because neither the introduction of the challenged evidence, nor the jury instruction as to its use, "so

infused the trial with unfairness as to deny due process of law"); *Bryson v. Alabama*, 634 F.2d 862, 864–65 (5th Cir. Unit B Jan. 1981)[6] ("A violation of state evidentiary rules will not in and of itself invoke Section 2254 habeas corpus relief.  The violation must be of such a magnitude as to constitute a denial of 'fundamental fairness.'").

Under Florida law, a defendant's out-of-court self-serving exculpatory statements are generally inadmissible hearsay.  *See Whitfield v. State*, 933 So. 2d 1245, 1248 (Fla. 1st DCA 2006) (citations omitted).   However, the rule of completeness, codified in Florida Statutes § 90.108(1), provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously. An adverse party is not bound by evidence introduced under this section.

Fla. Stat. § 90.108(1).  Thus, "if a partial statement, writing, or recording is admitted, the rule of completeness permits the opposing party to introduce other portions of that same statement, writing, or recording in the interest of fairness."  *Calloway v. State*, 210 So. 3d 1160, 1183 (Fla.  2017) (citing *Kaczmar v. State*, 104 So. 3d 990, 1000 (Fla. 2012)).  The rule applies equally to a witness' recollection of a portion of

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

a statement as it does to a portion of a statement admitted verbatim.  *See Layman v. State*, 728 So. 2d 814, 816 (Fla. 5th DCA 1999) (citing *Long v. State*, 610 So. 2d 1276, 1282 (Fla. 1992)).

As the First DCA explained in *Eberhardt v. State*, 550 So. 2d 102 (Fla. 1st DCA 1989):

> Because portions of the defendant's conversation with the officer were admitted on direct examination, the rule of completeness generally allows admission of the balance of the conversation as well as other related conversations that in fairness are necessary for the jury to accurately perceive the whole context of what has transpired between the two. (citation omitted).  Once the officer testified in the state's case-in-chief about one portion of Eberhardt's statements to him, the court erred in sustaining the state's hearsay objection for the reason that his statements he was "high" or intoxicated were self-serving.

*Id.*, 550 So. 2d at 105 (citation omitted).

The purpose of the rule of completeness is to "avoid the potential for creating misleading impressions by taking statements out of context." *Larzelere v. State*, 676 So. 2d 394, 401 (Fla. 1996); *see also Metz v. State*, 59 So. 3d 1225, 1226–27 (Fla. 4th DCA 2011).  Thus, when a party introduces part of a statement, confession, or admission, the opposing party is ordinarily entitled to bring out the remainder of the statement.  *See Ramirez v. State*, 739 So. 2d 568, 580 (Fla. 1999) (citations omitted).  "[T]he correct standard is whether, in the interest of fairness, the remaining portions of the statements should have been contemporaneously provided to the jury." *Id.*

(internal quotation marks and citation omitted).  "Fairness is clearly the focus of this rule."  *Jordan v. State*, 694 So. 2d 708, 712 (Fla. 1997).

However, the rule of completeness is not absolute.  *Ramirez*, 739 So. 2d at 580; *Layman*, 728 So. 2d at 816.  A trial court may exercise its discretion to exclude portions of a recorded statement.  *See Layman*, 728 So. 2d at 816 (citing *Long*, 610 So. 2d at 1280 (noting that portions of an entire videotape may be excluded if they are irrelevant or if their probative value are substantially outweighed by their prejudice)).

Applying the principles embodied in Florida's rule of completeness, and mindful of the deference owed state courts in construing their own evidentiary rules, Martin has not demonstrated that the trial court's application of Florida's rule of completeness deprived him of his constitutional rights to present his defense and to a fundamentally fair trial.

For starters, the undersigned is hard-pressed to find that the trial court's evidentiary ruling was erroneous.  Defense counsel did not seek to introduce **portions** of the audio/video recording, instead, he insisted that the rule of completeness required admission of the **entire** recording.  The trial court denied counsel's request to admit the entire recording which, as discussed *supra*, was within the trial court's discretion to do absent a showing that all of the recording was

relevant and not unduly prejudicial.  Further, the trial court did not restrict defense counsel from introducing portions of the interview that provided context to the statements attributed to Martin by Investigator Wilder on direct examination.

Martin's defense was that he did not penetrate, or intend to penetrate, M.W.'s vagina when he put his hand down the back of her shorts.  Martin claims that because the trial court prohibited him from introducing the entire recording, the jury did not hear the following:

> INVESTIGATOR WILDER:  But your hand made it underneath and you were grabbing her butt.

> DEFENDANT MARTIN:  Yes, that's right.

> INVESTIGATOR WILDER:  And I'll use non-clinical terms:  more of the cheek or more of the crack?  Or were you—you said you were moving your hands down toward her vagina, I'm assuming from behind?  Your hand wasn't going down the front of her pants—

> DEFENDANT MARTIN:  I mean, it went towards but it was not an intention to—

> INVESTIGATOR WILDER:  Well, let me ask:  Did you go in the waistband or the short?  Did you go up the leg?

> DEFENDANT MARTIN:  In the waistband.  And these are high waisted shorts.

> INVESTIGATOR WILDER:  But your hand was on her ass underneath her shorts, even if she had underwear on, but it was definitely skin-on-skin?

> DEFENDANT MARTIN:  True.

INVESTIGATOR WILDER:  And your hand is moving down towards her vagina, but—

DEFENDANT MARTIN:  But I never touched it.

(*see* ECF No. 5 at 8 (quoting from transcript attached to motion for new trial (ECF No. 10-1 at 63))).

As demonstrated by the trial transcript, defense counsel cross-examined Investigator Wilder about the portion of the interview relating to Martin's moving his hand down the back of the victim's shorts toward her vagina.  Counsel asked Wilder whether Martin indicated that it was not his intention to touch the victim's vagina, and Wilder answered, "Yes . . . his statement was it wasn't his—it was not his intention to touch her vagina."  During closing arguments, defense counsel reminded the jury of this testimony and argued that additional evidence of Martin's lack of intent was the fact that Martin moved his hand down the top of the victim's high-waisted shorts instead of moving it a shorter distance from the bottom of her shorts.

Martin has not shown that playing the entire recording of his conversation with Investigator Wilder would have explained or clarified the portions presented to the jury through Investigator Wilder's testimony.  Nor has Martin shown that without playing the entire recording, the jury was left with a mistaken or false

impression of his statement(s) regarding his intentions when he put his hand down the waistband of M.W.'s shorts. The jury heard Martin's statements that he put his hand down the back of M.W.'s shorts and moved it toward her vagina, "but it was not an intention to—," and that he did not penetrate it. Martin has not demonstrated that the trial court's prohibiting him from introducing the entire recording of the interview prevented him from mounting an effective defense or otherwise deprived him of a fair trial.

In sum, Martin has not demonstrated the state court's adjudication of his fair trial claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of clearly established federal law. Therefore, Martin is not entitled to federal habeas relief on the federal fair trial claim presented in Ground 1.

### 2.    IATC Claims

Martin asserts a related IATC claim, that defense counsel was ineffective for (1) failing to object to Investigator Wilder's testimony on re-direct examination on the ground that it was misleading and mischaracterized Martin's statement, (2) failing to request to recross-examine Wilder with the recording, (3) failing to object to the State's closing argument as misleading, and (4) failing to preserve, for appellate review, the claim that the recording should be admitted due to Wilder's

mischaracterizing Martin's statement during re-direct examination, and that exclusion of the entire recording violated Martin's right to a fair trial (ECF No. 5 at 12–13, 28–30).

The State concedes that Martin exhausted the IATC claims asserted in Grounds 1 and 5 (ECF No. 10 at 17, 45). The State contends the claims were adjudicated on the merits by the state court, and Martin had not satisfied the standard for habeas relief under § 2254(d) (*id.* at 23–25, 45–49).

### a.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The petitioner's burden to prove, by a preponderance of the evidence,

that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present— were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The Supreme Court instructed that in reviewing claims of ineffective assistance of counsel the court must be mindful of the following:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  There are

> countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). The petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are

subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting *Strickland's* high bar is never an easy task."   *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Richter*, 131 S. Ct. at 788.  As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### b.    Federal Review of State Court Decision

Martin presented his IATC claims as Grounds 1 and 2 of his Rule 3.850 motion (ECF No. 10-5 at 53–59).  The state circuit court adjudicated the claims as follows:

> The defendant's first claim relates to Investigator Wilder's testimony in redirect.  (Att. A, Trial Transcript excerpt, pages 242–245)  Defendant contends that counsel should have objected to the questions on redirect.  However, nothing objectionable was done in redirect and

nothing was "mischaracterized." The prosecutor elicited a quote from the officer. It was up to the jury to decide what that statement meant. If there was any mischaracterization, it was elicited by skillful cross-examination when defense counsel got the investigator to say that it was not the defendant's intention to touch the victim's vagina. (Att. A, Trial Transcript excerpt, page 242) On redirect, the prosecutor simply elicited the statement "It was not my intention . . ." (Att. A, Trial Transcript excerpt, page 243) Since there was no "mischaracterization," any objection would have been futile. Therefore, there was no ineffective assistance of counsel and no unfair prejudice.

The second claim also relates to the redirect testimony of Investigator Wilder. In this claim, defendant claims counsel was ineffective for not again raising the request to play the entire videotape after redirect examination of Investigator Wilder. The defense asserts this was necessary because Investigator Wilder "mischaracterized" the defendant's statement in redirect. The Court has already found this to be incorrect in ground one. The State did argue on appeal that this claim was not properly preserved. The defense vigorously argued to the contrary. (Att. B, Reply Brief of Appellant, pages 1–4) The District Court did not address the preservation issue on appeal. Therefore, it cannot be discerned how the District Court viewed the preservation issue. But, it is clear that defense counsel preserved Judge Lewis' initial ruling and nothing occurred in redirect to suggest that ruling was wrong. Nothing has been alleged suggesting Investigator Wilder took anything out of context on redirect. Therefore, there was no ineffective assistance of counsel or unfair prejudice.

(ECF No. 10-5 at 100–01).

Martin appealed the circuit court's decision to the First DCA (*see* ECF No. 10-5 at 161–74 (Martin's initial brief)). The First DCA affirmed the decision without written opinion (ECF No. 10-5 at 187–88 (decision)). *Martin v. State*, 297 So. 3d 525 (Fla. 1st DCA 2020) (Table).

The state court's conclusion, that Martin could not show he was prejudiced by defense counsel's alleged deficiencies, was not contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.  Undertaking the § 2254(d)(2) inquiry first, and applying that deferential standard of review, the undersigned cannot conclude that the Rule 3.850 court's description of the testimony presented at trial was an unreasonable determination of fact in light of the evidence presented in state court.  Indeed, the portions of the trial transcript attached to the circuit court's order support its findings.

Additionally, the state court's finding, that Investigator Wilder did not mischaracterize Martin's statement or take it out of context, was reasonable.  Martin asserts his actual statement was the following:

> INVESGATOR WILDER:   And I'll use non-clinical terms: more of the cheek or more of the crack?  Or were you—you said you were moving your hands down towards her vagina, I'm assuming from behind?  Your hand wasn't going down the front of her pants—

> DEFENDANT MARTIN:  I mean, it went towards but it was not an intention to—

> INVESTIGATOR MARTIN:  Well, let me ask:  Did you go in the waistband or the short?  Did you go up the leg?

> DEFENDANT MARTIN:  In the waistband.  And these are high waisted shorts.

(*see* ECF No. 5 at 8 (citing transcript of interview, ECF No. 10-1 at 63)).

Investigator Wilder's testimony on re-direct examination, that Martin did not actually state, "It was not my intention to touch her vagina" but actually stated, "It was not my intention to—" but did not finish the sentence, was not a mischaracterization.  With regard to context, defense counsel had already elicited the context of Martin's statement during cross-examination immediately prior to Wilder's testimony on re-direct examination.

Based on the record, a reasonable jurist could agree with the state court's determination that Investigator Wilder did not mischaracterize Martin's statement or take it out of context.  Martin thus has not satisfied § 2254(d)(2).[7]

Second, the court undertakes the § 2254(d)(1) inquiry—whether the conclusion of the Rule 3.850 court that Martin could not show deficient performance or prejudice under *Strickland*, was unreasonable.  Martin claims that defense counsel was ineffective for (1) failing to object to Investigator Wilder's testimony on re-direct examination on the ground that it was misleading and mischaracterized

---

[7] The court follows the Eleventh Circuit in *Tarleton v. Sec'y, Fla. Dep't of Corr.*, No. 18-10621, 2021 WL 3117460, at *8 n.5 (1tth Cir. July 23, 2021) and the Supreme Court in *Wood v. Allen*, 558 U.S. 290, 301 (2010), and assumes arguendo but declines to decide, that "the factual determination at issue should be reviewed . . . only under § 2254(d)(2) and not under § 2254(e)(1)." *Wood*, 558 U.S. at 301; *Tarleton*, 2021 WL 3117460, at *8 n.5.   Because the Rule 3.850 judge's determination of the facts "was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," the court does not need to decide whether the state court's factual determinations should be reviewed under the arguably more deferential standard set out in § 2254(e)(1). *Wood*, 558 U.S. at 301; *Tarleton*, 2021 WL 3117460, at *8 n.5.

Martin's statement, (2) failing to request to recross-examine Wilder with the recording, (3) failing to object to the State's closing argument as misleading, and (4) failing to preserve, for appellate review, the claim that the recording should be admitted due to Wilder's mischaracterizing Martin's statement during re-direct examination, and that exclusion of the entire recording violated Martin's right to a fair trial (ECF No. 5 at 12–13, 28–30).

A fairminded jurist could agree with the state court that there is no reasonable probability the jury would have returned a different verdict if defense counsel had done what Martin faults him for not doing. The jury was presented with undisputed evidence that Martin put his hand down the back of M.W.'s shorts, touched her buttock(s) with his fingers, and was moving in the direction of her vagina. The undisputed evidence also showed that M.W. woke up when Martin's hand was down her pants. The jury obviously did not believe that Martin's fingers actually penetrated M.W.'s vagina, but the jury clearly believed that Martin intended to do so. Upon review of the evidence presented to the jury and the transcript of the unpresented recording, a fairminded jurist could conclude there is no reasonable probability the jury would have reached a different conclusion regarding Martin's intent if defense counsel had played the recording. Put another way, there is no reasonable probability the jury would have concluded that Martin had no intention

of penetrating M.W.'s vagina in light of the undisputed evidence showing he put his hand down the back of her shorts, touched her buttock(s), and moved his finger(s) toward her vagina just prior to her waking up.

With respect to the prosecutor's closing argument, Martin contends defense counsel should have objected to the following statements as misleading: "Maybe he didn't intend to hurt her feelings. Maybe he didn't intend for her to go this far. Maybe he didn't intend—I don't know. But he didn't say that." (*see* ECF No. 5 at 13).

"To find prosecutorial misconduct, a two-element test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Gonzalez*, 834 F.3d 1206, 1226 (11th Cir. 2016) (internal quotation marks and citations omitted).

"It has long been held that a prosecutor may argue both facts in evidence and reasonable inferences from those facts." *Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985); *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (holding that the prosecutor is not limited to a bare recitation of the facts; she may comment on the evidence and express the conclusions she contends the jury should draw from the evidence). But prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may

reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted). Further, a prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue. *See White v. State*, 377 So. 2d 1149 (Fla. 1980).

Here, the prosecutor's comment was made in her second closing argument, after defense counsel had argued, "He [Investigator Wilder] did tell us on cross-examination that Tyson stated he didn't intend on touching Ms. W's vagina." (ECF No. 10-4 at 69). The prosecutor argued the following in response:

> But Investigator Wilder—he never said he did not intend to touch her vagina. When he had his memory refreshed with the transcript of the interview, he said he didn't—he said, "I never intended," dot, dot, dot. Didn't say what it was he didn't intend. Maybe he didn't intend to hurt her feelings. Maybe he didn't intend for her to go this far. Maybe he didn't intend—I don't know. But he didn't say that.

(ECF No. 10-4 at 100). The prosecutor did not misstate or mischaracterize the evidence, she simply pointed out that Martin did not actually finish his sentence, and she suggested hypotheticals to highlight that fact.

Considering the evidence adduced at trial and the fact that the jury was instructed that the attorneys' statements during closing argument were not evidence (*see* ECF No. 10-4 at 29), a fairminded jurist could agree with the state court's conclusion that Martin failed to demonstrate deficient performance or prejudice with

respect to defense counsel's failure to object to the prosecutor's statements referenced *supra*.

Finally, to the extent Martin contends defense counsel's alleged failures at trial prejudiced the outcome of his direct appeal (i.e., that defense counsel failed to preserve the claim that the recording was admissible due to Investigator Wilder's alleged mischaracterization of Martin's statement during re-direct examination, and that exclusion of the entire recording violated Martin's right to a fair trial), this is not the proper method of measuring prejudice under *Strickland*.  When the claimed error of counsel occurred at the guilt stage of trial, *Strickland* prejudice is gauged against the outcome of trial, not the outcome on appeal.  *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Martin has not demonstrated that the state court's adjudication of the IATC claims presented in Grounds 1 and 5 was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of *Strickland*. Therefore, Martin is not entitled to federal habeas relief on the IATC claims asserted in Grounds 1 and 5.

    **B.**    **"Ground 2:  The state trial court erred by allowing the State to amend the information on the morning of the trial."**

Martin asserts that on the first day of trial, the State filed an amended information that added an allegation that he "did unlawfully commit **or attempt to**

**commit** a sexual battery upon M.W." (ECF No. 5 at 17–21) (added language emphasized).  Martin asserts defense counsel objected to the amendment on the ground that he "anticipated that this was going to be an all-or-nothing type of situation" and was thus prejudiced in the preparation of the defense.  The trial court overruled defense counsel's objection.  Martin asserts if the trial court had not permitted the State to amend the information, the State would not have been entitled to a jury instruction on attempted sexual battery, which was the offense of which Martin was convicted (*see* ECF No. 5 at 20–21; ECF No. 18 at 6).  Martin contends the trial court's ruling deprived him of his constitutional right to notice and a fair trial under the Fifth and Fourteenth Amendments.  He contends the trial court's ruling and the First DCA's rejection of this claim on direct appeal were based upon an unreasonable determination of the facts and "contrary to and an unreasonable application of Petitioner Martin's constitutional rights" (ECF No. 5 at 21).

The State concedes Martin exhausted this claim by presenting it on direct appeal (*see* ECF No. 10 at 26).  The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 26–31).

The original information charged Martin with Sexual Battery When Victim Physically Helpless, as follows:

> COUNT I:  On or about July 3, 2014, [Tyson J. Martin] did unlawfully commit a sexual battery upon M.W., a person twelve years of age or older, by digitally penetrating her vagina, without the victim's consent, while the victim was physically helpless to resist, contrary to Section 794.01 I (4), Florida Statutes.

(ECF No. 10-1 at 16).

On the morning of trial, the State filed an Amended Information which again charged Martin with Sexual Battery When Victim Physically Helpless, but added the following:

> COUNT I:  On or about July 3, 2014, Tyson J. Martin did unlawfully commit **or attempt to commit** a sexual battery upon M.W., a person twelve years of age or older, by digitally penetrating her vagina, without the victim's consent, while the victim was physically helpless to resist, contrary to Section 794.01 I (4) **and 777.04**, Florida Statutes.

(ECF No. 10-1 at 17) (emphasizing added language).  Florida Statutes § 777.04 is Florida's attempt statute.

Defense counsel objected to the amendment as follows:

> [T]he State this morning handed me an Amended Information which we are going to object to.  It doesn't add anything other than the statutory citation for attempt, which, attempt has never been an issue in this case.  It's always been an allegation of a completed act.  I don't think it's appropriate.  And, certainly, we're procedurally prejudiced by them adding on the eve of trial, especially when we were set for trial previously, and this was not brought in whatsoever, and it literally was

not brought up to me until about 15 or 20 minutes ago.  We've anticipated that this was going to be an all-or-nothing type of situation.

(ECF No. 10-2 at 254–55 (trial transcript)).  The trial court inquired as to how the

defense was prejudiced:

> THE COURT:  What factually would be different in terms of prejudice?  I mean, if you're investigating the case, taking depositions, either—it either happened or it didn't happen.  It sounds like this would be, well, he tried to penetrate, but he didn't, that would be the—I guess the fallback from the State is if you don't think there was penetration and you think he tried to but he failed, then that would be—obviously, that's a legal argument.  It's not a factual thing that you would have to go prepare for, is it?
>
> MR. ZELMAN:  Well, I think it certainly would—from a procedural standpoint would have changed our preparation.  Certainly, we would have spent more time possibly preparing in Mr. Martin's testimony if that's what was going to happen.  I think the attempt issue—
>
> THE COURT:  Why—why would—why would his testimony be any different?
>
> MR. ZELMAN:  Well, it's not that it would be different,  Your Honor.  It's during these statements that my client made to law enforcement—which I don't know whether or not the State is going to use—I believe that the implication can be made and certainly was made by law enforcement, whether rightfully or wrongfully, that he was attempting to touch her vaginal area.
>
> Again, that gets into the confusion that we talked about in the jury instruction.  However, had we known that attempt was going to be an issue in this case, we certainly would have prepared differently, and I would have deposed Investigator Wilder, which we chose not to do because, you know, whether or not he testifies, it's mostly hearsay, if at all.

THE COURT:  Well, anything the Defendant said can come in as an exception to hearsay if it's relevant, so I just don't see the prejudice.  All they're doing is sticking a—as you just said, it's not factually different.  The only thing that's different is we've got this other statute that also may apply here.  So—but I will—if we get to the end of the trial, similar to this instruction here, and I see something that I haven't seen and you can renew that and object, and I will reconsider it, but—

MR. ZELMAN:    Thank you, Your Honor.

THE COURT:  —right off the face of it, I don't see any prejudice to the defense to that minor amendment.

(ECF No. 10-2 at 255–57).  The prosecutor responded that she thought it would be "cleaner" to amend the information but that the State was not required to amend it in order to request a jury instruction on attempt as long as there was some evidence to support the attempt theory, which she believed there was (*id.* at 257–58).

Rule 3.510 of the Florida Rules of Criminal Procedure provides, in relevant part:

Upon an indictment or information upon which the defendant is to be tried for any offense the jury may convict the defendant of:

(a) an attempt to commit such offense if such attempt is an offense and is supported by the evidence.  The judge shall not instruct the jury if there is no evidence to support such attempt and the only evidence proves a completed offense.

Fla. R. Crim. P. 3.510(a).

Contrary to defense counsel's assertion that attempt had "never been an issue in this case," Rule 3.510 put defense counsel on notice that Martin could be convicted on an attempt theory if there was any evidence to support it. Defense counsel knew about Investigator Wilder's interview with Martin and thus knew that the State had evidence to support an attempt theory.

Martin has not identified any case in which the Supreme Court held that notice of a charge was constitutionally inadequate where, although the defendant was initially adequately apprised of the offense against him (as Martin was here by virtue of the allegations in the original information), the prosecutor proceeded on more than one potential theory of liability, and the state's procedural rules authorized the prosecutor to do so. Because Martin has not identified a Supreme Court decision that clearly establishes the legal proposition needed to grant federal habeas relief, the AEDPA precludes this court from granting relief on Ground 2. *See Lopez v. Smith*, 574 U.S. 1, 5–7 (2014) (reversing grant of federal habeas relief because Supreme Court case law did not clearly establish that a prosecutor's focus on one theory of liability at trial (i.e., an aiding and abetting theory) can render an earlier notice of another theory of liability (i.e., an actual perpetration theory) inadequate).[8]

---

[8] In *Lopez*, the Supreme Court noted that the Court of Appeals cited *Russell v. United States*, 369 U.S. 749, 763–764 (1962); *In re Oliver*, 333 U.S. 257, 273–274 (1948); and *Cole v. Arkansas*, 333 U.S. 196, 201 (1948)) as clearly established federal law, but the Court held that these cases "stand for nothing more than the general proposition that a defendant mush have adequate notice of the

C.   **"Ground 3:   The state trial court erred by preventing the defense from introducing the photographs depicting the alleged victim's activities on the day following the purported offense."**

Martin asserts defense counsel attempted to admit six photographs (Defendant's Exhibits 8, 9, 13, 14, 15, and 16) that depicted M.W.'s activities on July 4, 2014, the day after the attempted sexual battery (ECF No. 5 at 21–24). Martin asserts the photographs were relevant to M.W.'s credibility, because they impeached her testimony that she was upset about the incident by showing that she went out drinking and partying the next day (ECF No. 5 at 21–24; ECF No. 18 at 6–7). Martin asserts the trial court permitted defense counsel to admit only one photograph, Defendant's Exhibit 14, which showed only M.W.'s smiling face, but the trial court ruled the other photographs were inadmissible because they had minimal probative value, and that value was outweighed by the danger of undue prejudice, specifically, the jury would use the evidence to judge M.W.'s character instead of her credibility. Martin concedes that the jury heard testimony from more than one witness, including M.W. herself, regarding M.W.'s activities on July 4.

The State concedes Martin exhausted this claim by presenting it on direct appeal (*see* ECF No. 10 at 32). The State contends the state court's adjudication of

---

charges against him," which was "far too abstract to establish clearly the specific rule [petitioner] needs." 574 U.S. at 5–6.

the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 33–38).

The five photographs at issue are part of the state court record (*see* ECF No. 10-4 at 145–54 (Defendant's proffered Exhibits 8, 9, 13, 15, and 16)).  Defendant's Exhibit 8 depicts M.W., Taylor Foster, and Lacey Marx standing together looking into the camera, with Foster and Marx holding drinks (ECF No. 10-4 at 146 (Defendant's Exhibit 8)).  During defense counsel's cross-examination of M.W., M.W. described the photo as depicting herself, Taylor Foster, and Lacey Marx hours prior to the attempted sexual battery (ECF No. 10-3 at 22–23 (M.W.'s testimony)).  Defense counsel sought to introduce Defendant's Exhibit 8 into evidence during Lacey Marx's testimony (*see* ECF No. 10-3 at 210).  Marx identified Defendant's Exhibit 8 as a photograph of her, M.W., and Taylor Foster taken while they were at the "Strip" on the night of the incident (*id*. at 210–11).

The State objected to admission of Exhibit 8, and the issue was discussed at sidebar as follows:

> MS. NORRIS:  Your Honor, my objection is going to be to relevance.  Under the Rape Shield Statute, the clothing or dress or manner of dress of the victim at the time of the offense is not admissible.  I don't see any relevance of showing this.  It's well established—

THE COURT:  Let me see, because I haven't seen any of the photos y'all are talking about.  This is the night of the—

MR. ZELMAN [defense counsel]:  Yes.

THE COURT: —of the event.

MR. ZELMAN:  Yes.

THE COURT: What's the relevance?

MR. ZELMAN:  Your Honor, it shows they were having a good time.  It shows that they are partying, drinking—

THE COURT:  On the night of the incident?

MR. ZELMAN:  Yes.

THE COURT:  So what?  What does that tend to prove that's relevant to the case?

MS. NORRIS:  I think it's already in evidence.  That would just be superfluous, and the only relevance would be to show her manner of dress.

MR. ZELMAN:  The clothing is in evidence.  I don't see how that's—how that's—

THE COURT:  I don't see any particular prejudice to this shot, but I'm still wondering what the relevance is.  It shows she was there having a good time.  So what?  It doesn't show her with him.

MR. ZELMAN:  If I could ask a few more questions, I think I can establish the relevance.  For example, how Ms. Marx came into possession of this photo, I think that would establish—

THE COURT:  Tell me how.  What's she going to say?

MR. ZELMAN:  She's going to say that M tagged her in this friend requested her on Facebook and tagged her on this on July 3rd.

THE COURT:  So what?

MR. ZELMAN:  I think it's relevant.  I mean, if she's been—arguably, if she's been raped by Lacey's roommate, why would she friend request Lacey the day after this supposedly happened and tag her in a photo?  It goes to [M.W.]'s credibility.

THE COURT:  Well, you can certainly ask her did she tag you in a photo and did she ask to be your friend if she wasn't before.  I don't know what—that's very, very tangentially relevant.  I don't see why you need a photo of what the actual photo was.  I agree with the State, it's—I don't think it's terribly prejudicial, but I don't think it's relevant.

MS. NORRIS:  I just don't think it's relevant is my objection.  I have no objection to the questioning about, you know, there was a photograph taken of the two of you, she tagged you, friended you on Facebook.  I don't have an objection to that.

(ECF No. 10-3 at 211–13).

Defense counsel continued his examination of Lacey Marx.  Ms. Marx testified that M.W. sent her a Facebook friend request on July 3, 2014 and "tagged" her (Marx) in the photograph (ECF No. 10-3 at 214–15).  Defense counsel renewed his request to admit Exhibit 8 into evidence (*id.* at 216).  The prosecutor objected on grounds of relevance (*id.*).  The trial court sustained the prosecutor's objection (*id.*).

The other photographs at issue are Defendants' Exhibits 9, 13, 15, and 16.  Defendant's Exhibit 9 depicts M.W. asleep with Taylor Foster looking into the camera and pouting over M.W.'s shoulder (ECF No. 10-4 at 148 (Defendant's

Exhibit 9)).  M.W. testified that the photo depicted her asleep (ECF No. 10-3 at 27–28 (M.W.'s trial testimony)).  Defendant's Exhibit 13 depicts, from left to right, M.W., a woman named Christi McCoy, and Taylor Foster standing together and looking into the camera (ECF No. 10-4 at 150 (Defendant's Exhibit 13)).  M.W. testified that the photo depicted the three of them on July 4 (ECF No. 10-3 at 36–38 (M.W.'s testimony)).  Defendant's Exhibit 15 depicts Taylor Foster's cleavage, with M.W. looking into the camera over Foster's shoulder (ECF No. 10-4 at 152).  M.W. testified that the photo depicted her and Foster on July 4 (ECF No. 10-3 at 40 (M.W.'s testimony)).  Defendant's Exhibit 16 depicts a close-up of M.W. sticking out her tongue, with Taylor Foster (and her cleavage) looking into the camera in the background (ECF No. 10-4 at 154).  M.W. testified that the photo depicted her and Ms. Foster on July 4 (ECF No. 10-3 at 40 (M.W's testimony)).

Defense counsel sought to admit the photographs during its case-in-chief, but the prosecutor objected:

> MS. NORRIS:  I do object to this photograph [Defendant's Exhibit 9].  My understanding is I don't believe the testimony—well, first of all, with all of these exhibits, I would note at the bottom are photos of all the other exhibits, so it's very hard to kind of—they all contain photographs that I object to.

> But having said that, this shows it was posted on July 6th.  This was posted on Taylor Foster's Facebook page.  Taylor Foster said she doesn't know when it was taken.  She [M.W.] wore that shirt throughout the weekend.

I guess the insinuation is maybe that she was wearing it that night or that she was wearing it the following days.

My argument, again, is that this is improper character evidence under the Rape Shield about how a victim is dressed or behaving, is not admissible.

I don't think that if—and under Ehrhardt, if it's not admissible on the day of the offense, I think this is an end run around the statute to try to show what she's—and this applies to all these pictures—to show what she looks like and how she behaves the days after the incident.

I don't think they are being offered for any relevant purpose, to prove anything but slut shaming, improper character evidence, to show that she's out partying and dressed like a whore, and I don't think they are probative of anything.  They are definitely much more prejudicial than they are probative.

There is testimony in the record now that she did go to the 4th of July party; that there were photographs taken of her where she appeared to be happy and that she was smiling.  I think that is sufficient to argue, well, she's not behaving like the victim of a sexual battery behaves, whatever that is.  But I think that the photographs are meant to be inflammatory and have no other relevant purpose.

THE COURT:  Okay.  What do you say about No. 9?

MR. ZELMAN:  Specifically with respect to No. 9, the testimony was that this was taken on July 4th, that was testified to by Taylor Foster.  She was very clear about her testimony. This is the same top that was—that is in evidence.  So it contradicts the statement that was made to Officer Pinkard that it hadn't been washed, it hadn't been worn.

THE COURT:  There was no testimony it hadn't been worn. There was testimony she hadn't washed it.  I don't even think she said that.  You said it or somebody said it in opening statement, but I didn't hear any testimony about it.

MR. ZELMAN: I don't remember specifically, Judge. However, the photo was authenticated by Ms. Foster.

THE COURT: What's the relevance?

MR. ZELMAN: What's the relevance?

THE COURT: Right. Yeah, I agree Ms. Foster said this was taken on July 4th.

MR. ZELMAN: The relevance is that it shows what she's doing subsequent to the event. We are not slut shaming as the State stated, and this certainly is not something that is covered by the Rape Shield Statute.

THE COURT: Well, how does this show what she's doing? It's a picture of her—I guess this will go on the record one way or the other, but it's—it's a photograph of who has been identified—I couldn't tell you who it is—but it's been identified as MW, and I suppose that's Ms. Foster who is making kind of a pouty face there. It shows her [M.W.] presumably intoxicated to the extent that she's either passed out or can't walk on her own or whatever. So what exactly is it that you think this proves or disproves?

MR. ZELMAN: I think it's relevant to show her behavior in the days subsequent to the allegation that she has made that Mr. Tyson— Mr. Martin sexually battered her.

THE COURT: What does that add to—the testimony already is that they were out drinking the day after, maybe the following day. Well, the day after would be the 4th, that's the day you're talking about, right?

MR. ZELMAN: Right, this was the 4th.

THE COURT: Right.

MR. ZELMAN:  I don't believe that we have any pictures from the 3rd.  However, this—you know, yes, there's been testimony, there's obviously been testimony.  However, I think it's significant to show that contrary to the—to Ms. W's testimony that she was upset and kept to herself, during the days subsequent to this incident, she was out partying, she was drinking, drinking so much that she appears to be passed out.  I think that is entirely relevant and material to our—

THE COURT:  Yeah, I agree with the State, that the probative value of this is very slight considering the context of all the other testimony and evidence; and the prejudicial effect of it, the danger that the jury will not use it to affect [sic] the credibility of the witness but, rather, judge her by her character afterwards is great, and so I agree that this picture should not come in.  Okay.  Let's go to No. 13.

MR. ZELMAN:  We'd certainly like to proffer that in the record, Your Honor.

THE COURT:  I assume you're going to proffer all those I said. It'll be in the record one way or the other.

Does the State have an objection to 13?

MS. NORRIS:  I'm sorry.  On 13, it's the same objection for—I mean, again, I think—I don't think she looks bad or anything in this photograph, but, again—

THE COURT:  Which one is—which one is the—Ms. W?

MS. NORRIS:  Ms. W is the one on the far left, and on the far right is Ms. Foster.  Again, my issue is if the way and the manner in which a victim is dressed on the date of the offense is inadmissible, why is her manner of dress later on admissible?

I know that the argument is it's being offered to prove she was out having a good time.  But, again, I think the danger of unfair prejudice, showing, look, she's wearing spaghetti straps and really high, short shorts and she's being provocative and sexy and showing

her legs and arms, I just—I don't know what probative value it adds. I object on relevance grounds there because I'm not sure what it adds.

THE COURT: Okay, and I assume you have the argument to all the photos that you have. This one, I would say it is a little different because it's been identified as a—this shows us having a party on the 4th or being at party on the 4th. There's nothing, to me, inappropriate about the dress in terms of July 4th holiday, and they all seem to be dressed the same. There's been no suggestion, as counsel says, that we're showing she's a slut or something like that.

MS. NORRIS: Can I—

THE COURT: And it doesn't have all the extra stuff that some of the other photos have as well. So it shows that she appears to be having a good time on July 4th. A picture is sometimes is worth a thousand words. And even though there's testimony, yeah, we went out partying, this is her smiling with her friends. So I would say this would come in.

Do you want to put on something else for the record?

MS. NORRIS: My—looking at No. 14, then—I believe, 13 and 14, I think 14 can establish that she's out having fun on the 4th with her friends just as well as 13 can without showing the manner of dress, just showing her smiling. So I would say that they would be—what's the word? Cumulative. And I would ask that the court enter 14 rather than 13 because they are showing essentially the same—

THE COURT: Oh, I see what you're saying.

MS. NORRIS: —relevance, I guess.

THE COURT: How about the other photos and the other miscellaneous stuff on there other than the photo?

MS. NORRIS: We could redact it.

THE COURT:  What do you say?

MR. ZELMAN:  I certainly don't have a problem redacting the stuff underneath.  With respect to the cumulative nature, part of the argument that we are making is that she had contact with all these other people in the days after the incident and didn't say anything to anybody. I think that's entirely material.  I think it's relevant, and it's significant to our argument in this case, the defense—

THE COURT:  I agree with the State.  I'll give you one photo that shows her out smiling with her friends, to show that she was—

MR. ZELMAN:  Judge, this is a different friend.

THE COURT:  Pardon me?

MR. ZELMAN:  This is a different friend.

THE COURT:   I don't care.   The reason I consider this tangentially relevant is to support your argument that she had several days, several opportunities to go to the police or report.  She didn't.  She was out doing something that you can argue is inconsistent with somebody who says they were very upset.  You don't need several photographs to show her apparently having a good time.

MR. ZELMAN:   Judge, I mean, you said it yourself a few moments ago, a picture is worth a thousand words.

THE COURT:  That's why I'm willing to give you a picture that shows that but not several.  And looking at those photographs, I think you can get the same thing and overcome to [sic] the State's objection to No. 13, which is the dress.  This is not showing the dress, just shows everybody smiling, as a matter of fact, just as well or better; and you take out all the other stuff, I think that would be fine.

So given the argument on that, I would say 14, cropping that photograph will be fine.  You got 15, and I know what the State's objection is. So tell me—tell me about 15, and 16 looks very similar.

MR. ZELMAN:  Again, Judge, these all go to her actions, her behavior on the days subsequent to—

THE COURT:  Well, let's go with 15.  Who is in 15?

MR. ZELMAN:  That is—15 is Ms. Foster and Ms. W.

THE COURT:  And which one is Ms. W?

MR. ZELMAN:  The one in the back.

THE COURT:  Which one?

MR. ZELLMAN:  The one in the back.

THE COURT:  She is smiling with her friend.  What's—what's—what's the significance of that versus 14?

MR. ZELMAN:  Your Honor, I think these both took place on July 4th during different times.  It's consistent with and it corroborates the testimony that we have that she's out the entire day, having a good time, partying, celebrating, everything that's inconsistent with somebody who has been a victim of a sexual assault.  It's inconsistent with her testimony that she was upset and—

THE COURT:  Well, I've already given you that in terms of the other photo.  But I'm saying I'll give you a photo that shows her out in her—like I said, you can admit there's a little difference between her saying, yeah, I was out partying all day.  She's already admitted that. You got the testimony of other people that say that was what was happening, and you can corroborate that with a photo that shows her smiling with her friends, which you have.  So what does this add other than that?

I don't see it.  Other than showing Ms. Foster and her cleavage, it doesn't add anything.  The other one is having her—it looks like maybe Ms. W sticking her tongue out.

MR. ZELMAN:  Having a good time.

THE COURT:  Yeah, okay.

MR. ZELMAN:  I mean, a single photo, when they were talking a single photo or five photos, which I think is what this is, five or six photos, I don't see how that's cumulative.  They are not the same issue. It's not like we're talking about a gruesome crime scene where the defense is objecting that, you know, we're trying to inflame the jury.

We're not trying to inflame the jury here.  All we are doing is trying to show it's inconsistent with her claim of being upset and sad and in shock and whatnot, all of these photos are inconsistent with that. And—

THE COURT:  Well, like I say, I don't mind having a photo that corroborates that there's—there's absolutely no dispute in the evidence right now that Ms. W was out at a party July 4th, and that's what this corroborates.

And you have a—like I say, if they want to see her and see how she was having a good time, that's fine; but I don't see why you have to have several photos to do that, other than to show her and I guess to judge her by what she's doing then.  And, plus, this also has other extraneous stuff on it, all the several photos.  To the extent that her facial expressions might suggest something, that's different.
. . . .

MR. ZELMAN:  Judge, they all—they all go to the same issue. They all go to the inconsistency with her claim of being sad, upset.

THE COURT:  Well, if that's all they prove, you already have that.  You already have her admission that she was out doing it.  I've given you a photo which shows her smiling, which corroborates that she's apparently having a good time, is not upset.
. . . .

So I'll give you No. 14, cropped off with the extraneous things that shows, apparently, her—with friends? I'm not sure which one is Ms. W. Is Ms. W in No. 14?

MR. ZELLMAN: She's the one in the middle.

THE COURT: The one in the middle? Even better, because she's there with a big smile on her face.

MR. ZELMAN: Judge—

THE COURT: Okay.

MR. ZELMAN: —and with respect, all the other photos, my client has a constitutional right to put on a defense for the jury to see the full picture of what was going on.

THE COURT: I understand it's a constitutional right to present a defense, and I have my right, though, to make rulings, and I have made it, so those are—those are my rulings on the photos. No. 14 can be cropped, and you can introduce that.

. . . .

MS. NORRIS: And I just wanted to note for the record that, similarly, when the Court does the 403 weighing test on the undue prejudice to the defense pursuant to Ehrhardt under the Rape Shield Statute, the court is to make that weighing, but with the victim being the one about the undue prejudice, so I do believe you have support of that in the statute.

(*see* ECF No. 10-3 at 300–12).

The State re-called M.W. in rebuttal (*see* ECF No. 10-3 at 314–18). The prosecutor asked her why she was "going out having fun" on July 4 after what happened to her on July 3 (*id.* at 317). M.W. responded:

> If I stayed at home, that's all I thought about.  And my boyfriend was in town, and I wanted to try and forget about it, and I wanted to just try and be normal and forget that it happened and enjoy the weekend that I had with my boyfriend while he was in town, and I wanted to try and forget about it.  That's all I wanted to do, was just forget that it happened.

(ECF No. 10-3 at 317).

Martin appealed the trial court's evidentiary ruling to the First DCA (*see* ECF No. 10-4 at 203–07 (Martin's initial brief)).  Martin argued that the trial court's exclusion of the photographs violated his federal constitutional right to present a defense and to confront witnesses against him (*id.*).  Martin cited *Taylor v. Illinois*, 484 U.S. 400,408 (1988), *Washington v. Texas*, 388 U.S. 14, 23 (1976), *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), and *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (*id.* at 205).  The First DCA affirmed without written opinion (ECF No. 10-5 at 45–46).  *Martin v. State*, 247 So. 3d 422 (Fla. 1st DCA 2018) (Table).

As discussed *supra*, the defense sought to admit the photographs to impeach the victim's credibility.  The defense argued Exhibit 8 was relevant to M.W.'s credibility because if she had been sexually battered by Martin, she would not have sent a friend request to Martin's roommate (Lacey Marx) and tagged her in a photograph hours after the incident.  The defense argued Exhibits 9, 13, 15, and 16 were relevant to impeach M.W.'s testimony that she was upset after the incident,

because it showed that she was drinking and partying with friends the day after, instead of immediately reporting the alleged sexual battery to police.

The trial court ruled that the photographs were "tangentially" relevant and of minimal probative value, especially since the jury heard testimony on the same subjects depicted in the photographs, and one of the photographs (Defendant's Exhibit 14) was admitted into evidence. The court further held that the minimal probative value of the excluded photographs was substantially outweighed by the danger of unfair prejudice.

The trial court's analysis hinged on three of Florida's evidentiary rules, set forth in Florida Statutes §§ 90.401–.403. Florida Statutes § 90.401 defines relevant evidence as evidence "tending to prove or disprove a material fact." Section 90.402 provides that "[a]ll relevant evidence is admissible, except as provided by law." Section 90.403 sets forth the following exclusion:

> Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.

Fla. Stat. § 90.403. The standard for applying this exclusion is as follows:

> This statute compels the trial court to weigh the danger of unfair prejudice against the probative value. In applying the balancing test, the trial court necessarily exercises its discretion. Indeed, the same item of evidence may be admissible in one case and not in another, depending upon the relation of that item to the other evidence.

*Twilegar v. State*, 42 So. 3d 177, 194–95 (Fla. 2010) (citing *State v. McClain*, 525 So. 2d 420, 422 (Fla. 1988)).

Additionally, and specifically with respect to Defendant's Exhibit 8 (the photo of M.W. standing with Taylor Foster and Lacey Marx hours prior to the sexual assault), Florida's "Rape Shield" statute provides that evidence presented for the purpose of showing that manner of dress of the victim at the time of the offense incited the sexual battery is inadmissible in a sexual battery prosecution. *See* Fla. Stat. § 794.022(3).

Martin relies upon the same Supreme Court cases he relied upon in his direct appeal, *Chambers*, *Taylor*, *Washington*, and *Davis*. Martin cites the first three, *Chambers*, *Taylor*, and *Washington*, for the general proposition that the Fifth, Sixth, and Fourteenth Amendments guarantee a defendant the right to present a defense (*see* ECF No. 5 at 23). And Martin cites the fourth case, *Davis*, for the general proposition that the Sixth Amendment guarantees a defendant the right to confront witnesses against him (*id.*).

The Supreme Court has "cautioned the lower courts . . . against 'framing our precedents at such a high level of generality'" on federal habeas review. *See Lopez*, 574 U.S. at 5–6 (quoting *Nevada v. Jackson*, 569 U.S. 505, 512) (2013)). In order to qualify as "clearly established federal law," for purposes of § 2254(d)(1), Martin

must identify a Supreme Court case that addresses the specific question presented in his case.  *See Lopez*, 574 U.S. at 6.

In *Chambers*, the Supreme Court held that the exclusion of trustworthy third-party inculpatory confessions based on the mechanistic application of outdated evidentiary rules violates a defendant's right to due process.  410 U.S. at 293–94. The defendant in *Chambers* was unable to introduce the inculpatory confessions because the state where the crime occurred, unlike most other states, had not recognized an exception to the hearsay rule for declarations against penal interest, which would have rendered the confessions admissible.  *Chambers*, 410 U.S. at 298–301.

In contrast, Martin's case did not involve exclusion of an inculpatory confession of a third party; rather, it involved the exclusion of extrinsic evidence of instances of the victim's conduct to impeach her credibility (i.e., M.W.'s "tagging" Lacey Marx in the photo even though Marx's roommate had allegedly sexually battered her (Defendant's Exhibit 8)), and M.W.'s celebrating with friends in the photos from July 4 (Defendant's Exhibits 9, 13, 15, and 16).  The admission of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility may confuse the jury and unfairly embarrass the victim.  *See Jackson*, 569 U.S. at 511.  No decision of the Supreme Court clearly establishes that the

exclusion of such evidence for the reasons identified by the trial court in Martin's case violates the Constitution. *See id.*

Moreover, the trial court's exclusion of the photos did not deprive Martin of his right to present a defense. As previously discussed, the jury heard testimony that M.W. sent Lacey Marx a Facebook friend request and tagged her in the photo later on the same day that Martin attempted the sexual battery. And the jury heard testimony, from Taylor Foster and M.W. herself, that M.W. was drinking and "having fun" between the time of the attempted sexual battery (on July 3) and the time M.W. reported it to police (on July 6). Additionally, the trial court permitted the defense to admit one of the July 4 photos (Defendant's Exhibit 14) which showed M.W. at a party with friends on July 4.

Martin's citation to *Taylor v. Illinois* is also unavailing. In *Taylor*, the Supreme Court was presented with the issue of whether a trial court's refusal to allow a defense witness to testify, as a sanction for failing to identify the witness during pre-trial discovery, violated the defendant's constitutional right to obtain the testimony of favorable witnesses. 484 U.S. at 402. The Supreme Court held that such a sanction was not absolutely prohibited by the Compulsory Process Clause of the Sixth Amendment and found no constitutional error on the specific facts of the case. *Id.*

Here, Martin was not prohibited from presenting evidence or witnesses to impeach M.W.'s credibility. Indeed, defense counsel presented such evidence in the form of testimony from defense witness Lacey Marx, in addition to the testimony elicited from Taylor Foster and M.W. *Taylor* does not "clearly establish" that the trial court's exclusion of the photographs in Martin's case violated Martin's right to present a defense.

The same is true of *Washington v. Texas*. In *Washington*, the Supreme Court was presented with the issue of whether a defendant's Sixth Amendment right to have compulsory process for obtaining witnesses in his favor was applicable to the States through the Fourteenth Amendment, and whether that right was violated by a state procedural statute providing that persons charged as principals, accomplices, or accessories in the same crime cannot be introduced as witnesses for each other. 388 U.S. at 14–15. The Court held that the Sixth Amendment's right to compulsory process was applicable in state criminal proceedings. *Id.* at 19. The Court further held that Washington was denied his right to compulsory process because the State "arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23.

As previously discussed, the trial court's exclusion of the photographs at issue did not prevent Martin from presenting impeachment evidence on the subjects depicted in the excluded photos.  Therefore, *Washington*  provides no basis for habeas relief.

Martin's final citation is to *Davis v. Alaska*.   In *Davis*, the Court confronted the issue of whether the Confrontation Clause required that a defendant be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as juvenile delinquent, when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency.  415 U.S. at 309.  The Court held that defense counsel should have been permitted to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness," and that the trial court violated the Confrontation Clause by limiting defense counsel's cross-examination regarding how the witness's fear or concern for his probation status may have affected his testimony.  *Id.* at 318.

Again, Martin was not precluded from presenting impeachment evidence, by way of cross-examination or otherwise, on the subjects depicted in the excluded photographs.  *Davis* thus affords him no relief.

Comparing each of the cases relied upon by Martin to the specific question presented in this case, the undersigned concludes that Martin has failed to demonstrate that the First DCA's rejection of his federal constitutional claim was contrary to or unreasonable application of clearly established federal law. Therefore, Martin is not entitled to federal habeas relief on Ground 3.

**D.    "Ground 4:  "The state trial court erred by failing to give the special jury instruction requested by the defense."**

Martin asserts the trial court erred by failing to give a special jury instruction which would have clarified the definition of "vagina" (ECF No. 5 at 25–28; ECF No. 18 at 7–8).    Martin asserts it was important for the jury to be instructed that he could only be guilty of attempted sexual battery if he had the intent to penetrate M.W.'s vagina.  Martin asserts Investigator Wilder testified he used the terms "vagina" and "vaginal area" interchangeably during his interview with Martin, and that Martin admitted his fingers "moved toward the area" but did not make it to M.W.'s vagina.  Martin asserts the standard jury instruction did not adequately distinguish between "vagina" and "vaginal area," but the special jury instruction defined vagina, vulva, labia majora, labia minora, clitoris, and vaginal orifice. Martin contends the trial court's refusal to give the special jury instruction deprived him of his right to a fair trial under the Fifth and Fourteenth Amendments.

The State concedes Martin exhaust Ground 4 by presenting it on direct appeal (ECF No. 10 at 38–39). The State contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 39–44).

The special jury instruction requested by the defense was the following:

An issue in this case is whether Tyson Martin penetrated M[.] W[]'s vagina with his finger(s).

The word vagina is defined as the canal which forms the passageway between the cervix uteri and vulvae.

The vulva is defined as the external genitals of the female, including the mons; the labia majora, the labia minora. the clitoris, and the vaginal orifice.

The labia majora is defined as the two folds of cellular adipose tissue lying on either side of the vaginal opening and forming the lateral borders of the vulva. The labia minora is defined as the two thin folds of integument which lie within the labia majora and enclose the vestibule. The clitoris is defined as the fold of skin at the top of the labia minora. The vaginal orifice is defined as the area between the labia minora into which the urethra and vagina open.

The vulva, including the mons, the labia majora, the labia minora. the clitoris, and the vaginal orifice, is NOT part of the vagina.

To prove the crime of sexual battery by digital penetration, the State must prove beyond all reasonable doubt that Tyson Martin inserted his finger(s) into the vagina of M[.]W[.].

If you have a reasonable doubt as to whether Tyson Martin digitally penetrated M[.]W[.]'s vagina, you should find the Martin [sic] not guilty.

However, if you are convinced beyond a reasonable doubt that Tyson Martin digitally penetrated M[.]W[.]'s vagina, you should find Tyson Martin guilty if all the elements of the charge have been proved.

(ECF No. 10-4 at 132–33 (Defendant's Request for Special Jury Instruction)).

Defense counsel raised the issue of the special jury instruction prior to the taking of testimony at trial:

MR. ZELMAN:  I've also filed a request for a special jury instruction.  I'm bringing it up now because I would like to address it during opening.  This is a case involving digital penetration.  Your Honor may recall a number of years ago that Laurel Mobley had a case before Your Honor in which she requested a special instruction very similar to the one that we have prepared.  It was filed with the Court on April 7th.  May I approach?

The significance of the instruction, Your Honor, in a digital penetration case can't be overstated.  In common parlance, the term "vagina" refers to the vaginal area and that, in fact, happened here both in Ms. W's statement to the police as well as Investigator Wilder's interview with my client.

There was significant confusion over whether or not there was penetration of the vagina versus touching of the vagina, and I think that it's going to be very significant that the court instruct the jury what is not considered to be the vagina for purposes of the sex battery statute, which is why I have included in this request specific definitions of the vagina, which excludes the labia majora, the labia minora, and the clitoris, as well as the vaginal orifice, and specifically the vulva, which includes the mons, the labia majora, the labia minora, the clitoris, and the vaginal orifice, not part of the vagina.

We think it's appropriate in this case for the court to give that instruction.  Obviously, you haven't heard the evidence.  I bring it up

now because I would like to address it during opening statement so that the jury is aware they need to pay attention to those issues during trial.

THE COURT:  How would it come up in opening statement?

MR. ZELMAN:  Well I've outlined what I believe the testimony is going to be, and I'm going to ask the jury that merely my client being accused of touching her vagina isn't enough, touching the clitoris, the labia majora, the labia minora would not be—

THE COURT:  But that's—that's argument.  That's not—opening statement is here is what the evidence will be.

MR. ZELMAN:  I agree, Your Honor.  I think summarizing what they are expected to hear is going to be important.

THE COURT:  But that wouldn't include a legal definition of vagina, I don't think, would it?

MR. ZELMAN:  Well, I think that they need to be aware that it's an issue in—

THE COURT:  Well, you can certainly say, I mean, say, you know, there are some facts that are not in dispute, some facts that are in dispute; and one of the facts that are in dispute is that there was digital penetration of the vagina, so listen closely to whether there was or not. Then the question of—I mean, I'm not saying I will or I won't give the instruction.  But I—when you said you'd like to address it in opening statement, I would think there would be an objection from the State if you started arguing here is what happened, here is what didn't happen, in terms of—

MR. ZELMAN:  Well, I'm certainly not going to be arguing, Your Honor.  But I want them—I don't want them to be uncomfortable with that concept when it comes to listening to it during trial and certainly later on during closing argument.

THE COURT:  Have you run this by the State?

MR. ZELMAN: Yes. That's why—one of the reasons we're bringing it up now. I don't believe that Ms. Norris agrees with the whole definition that we're requesting.

THE COURT: Well, I'll hear argument. Okay. You said and I do remember another case with this—

(Discussion off the record.)

THE COURT: Did I give the instruction in that case?

MR. ZELMAN: Yes, Your Honor.

THE COURT: So that might be good precedent, but—

MS. NORRIS: May I just be heard briefly?

THE COURT: Yeah.

MS. NORRIS: I think, you know, this is a digital penetration case. The case law is clear that there has to be some entry into the vagina, it could not be simply touching on the out—you know, the external genitalia. But I think that even the cases cited by the defense, the first one being—and I know we are not going all into it, but *Richards v, State*, which is at 738 So. 2d 415, says at the end, we emphasize that we are not holding that an instruction defining vagina is required in every digital penetration case. It was necessary in this case because of the confusion created by the State. And—

THE COURT: What was the confusion?

MS. NORRIS: I think there was a lot of back and forth with the child's private parts about—hold on, I don't want to—about her female area, her vaginal area, things like that, that were a little misleading because one could be external versus the penetration of the internal required for digital penetration. I would prefer that the court wait and listen to the evidence in this case.

THE COURT:  Well, that's what I do.  I'm not saying I will or I won't give it, but—

MS. NORRIS:  Right.  So at that point, I mean, I do think it's improper, and I've not seen any medical expert that has been disclosed.

I don't know what other case this was given in, whether there was a doctor who examined the child's genitalia and discussed external versus internal.  I mean, there's so much science written in here, I don't know if it's accurate.  I don't know where it came from.  I have no objection to, after the definition of sexual battery, putting in a definition of the vagina is the tube leading from the external genitalia to the cervix and the uterus, something simple like that.

I just—at this point I'm not sure that all of the definition of vulva and labia majora and labia minora and the vaginal orifice, I think that is extremely confusing.

I also anticipate that this victim will testify as she had in her interview and in her deposition that this Defendant's fingers were as deep inside of her vagina as they could possibly go.  So I really don't think this is going to be a borderline case.  I would like to confuse the jury as little as possible.

I do think it's inappropriate to argue about entry, penetration, but just say, hey, his finger has to actually enter her vagina, it has got to enter and penetrate it, so listen for that, and I think that would be appropriate.

So I would ask the court to reserve ruling with respect to that jury instruction just yet and wait and not allow this detailed scientific terminology to be used during opening statement.

THE COURT:  Oh, yeah, I didn't say I was going to give it, I was just trying to figure out—he wants— he wanted to argue—or not argue, he wanted to bring it up in his opening statement, and that's why I was questioning why—why would this come up in opening statement?

If we're—if we're just talking, I do think—I mean, if I'm sitting on the jury, unless I'm a gynecologist, I'm going, "Huh?" with all this stuff.

But I will—yeah, I'll leave it open. When we get to that point, if I think the jury needs some clarification, I will. I think it's certainly permissible for you to raise that as a defense and point the jury to the fact that we are not saying—you know, if that's your defense, I don't know—we're not saying something didn't happen, but there was no penetration. If that's your defense, you can certainly say that.

(ECF No. 10-2 at 248–54).

The parties again addressed the special jury instruction during the charge conference after the close of the evidence:

MR. ZELMAN: Judge, as—in sitting in the last couple of days, we all know this is a digital penetration case. Digital penetration requires—or digital—sexual battery by digital penetration requires actual penetration.

During testimony of both Ms. W. and Investigator Sergeant Wilder, they both conceded at various times that there was a comment about either hands down her pants or vaginal area.

I think it's significant for the jury to know that in order for them to convict Mr. Martin, that there actually has to be penetration, not of the vulva, not of the clitoris, not of the labia, but of the vagina. And I think it's supported by the cases that are cited in our request for special instruction.

THE COURT: Right, I read those cases.

MR. ZELMAN: Okay.

THE COURT:  Obviously, it's required that they prove that. But—but I guess the question I have—and I suggested this when we talked about it—is I don't know that this really helps the jury on that issue.

Certainly, you have to prove it.  I note that I've got four ladies on the jury.  I can't imagine that a jury doesn't know what a vagina is. And if I were sitting there, and you gave me a description and started describing or defining vulva and all that, I would just get lost, and it would not help me at all in determining whether there was actually penetration of the vagina.

And I looked at those cases, and I also looked in the statute, there is no legal definition of vagina.

MR. ZELMAN:  That's correct.

THE COURT:  So I think the Supreme Court presumes that the jury will use their common sense and know.  And, yeah, there's some conflict in the testimony about whether there was penetration, and they are going to have to prove there was.

There's testimony from the victim without any doubt in her mind there was penetration.  There's testimony from the officer, from the Defendant's statement that, "I touched her, but never even got near her vagina."  So, you know, the jury can resolve that.

You know, I don't know even—I started thinking, well, maybe I can define vagina, it wouldn't hurt anything.  But I'm at that definition, it's:  The canal which forms the passageway between the cervix and the uteri and vulvae.  And then I've got to describe what in the world is that.   So I don't know what the State—maybe the State has reconsidered, but you did object to it originally, I think.  What's your position?

MS. NORRIS:  Your Honor, my position is the same.  I mean, I think the Court has—Your Honor has a duty and a responsibility to

make things about the law clear to the jury, not to obfuscate the issues even more than there already are.

I think that *Richards v. State*, which I cited previously, 738 So.2d 415, is on point because in that case they said, "We emphasize we are not holding that the instruction defining vagina is required in every digital penetration case. It was necessary in this case because of the confusion created by the State."

And in this case, I think the Court characterized it correctly, you've got one person saying fingers were as deep in the vagina as they could possibly go; and one person saying I never even touched her vagina, not even the outside, not the—not her labia minora, rnajora, vulva, nothing, didn't even touch anything. So it's a matter of—there is no in between. If this had—if maybe we had had a factual scenario of him touching the outside or in between her vaginal lips but not penetrating, it might be appropriate. But I simply think that the court has to look at the evidence in the record and determine if that's a factual issue that's going to be at stake.

I do think it's confusing, and I don't even know—I mean, what is the vaginal orifice? Is that not the vagina? Is that—

I'm also a little worried because we don't have any medical testimony to support any of this. Nobody is available to cross examine about exactly where these things are and what they are. I don't know your scientific, anatomical background. But it just—I don't know what all this stuff means.

I'm going to have a difficult time arguing it when I don't even understand it, much less arguing it to the jury. And above and beyond that, I think there's a lot of superfluous things about an issue in this case is whether—et cetera, I think that's clearly an element.

To prove the crime of sexual battery, the State must prove—that's already an element, it would be repeating something that's redundant.

If you have a reasonable doubt, that's already—the jury has already been instructed that the State has to prove each element beyond a reasonable doubt, so I don't think that this is helpful.  I object to the court reading it.  It clearly says penetration of her vagina is required, and I think that the jury will know what that is.

MR. ZELMAN:  Respectfully, Judge, I think that there is some confusion in the statute, and one of the reasons why these courts have held that an instruction is necessary is because it's not defined in the statute.  We have a situation where, yes, there are four women on the jury.

THE COURT:  Maybe I missed it.  Do you have a case that that says I need to give this instruction?  Because of a confusion in the law?

MR. ZELMAN:  That's what I'm looking for, Judge.

THE COURT:  I could see, for example, if you had a child, a child victim who said, well, he touched my tee-tee, or he—you know, then it's not going to be really clear.  You may in certain circumstances have to try to do that. I don't know if I would go into all that, but still—

MR. ZELMAN:  Well, certainly, instead of denying the request, certainly ferret it out.  I think it's significant to make the distinction between the labia, the clitoris, and the vagina itself.  I think it's commonly held and commonly believed that the vagina is a woman's entire private parts.

Now, yes, there has not been any medical testimony, and I think medical testimony, when we are getting into this—into the discussion of the definition of a vagina, I don't think it's appropriate in most criminal cases because this is a legal definition, not a medical definition.  We have two demonstrative exhibits—

THE COURT:  But do you have a case in which this legal—legal jury instruction is given?

MR. ZELMAN:  I'm sorry?

THE COURT:  But do you have a case there that—where this instruction—

MR. ZELMAN:  This specific instruction, no.

THE COURT:  What instruction was given?

MR. ZELMAN:  I think that they—

THE COURT:  The cases I saw were all having to do with the sufficiency of the evidence.  And certainly saying, you know, contact alone is not enough, you have to show penetration.

MR. ZELMAN:  Right.  And, you know, our position is—

THE COURT:  Okay.  Is there—is there a case that—that says you must give a specific instruction?

MR. ZELMAN:  I don't think that there's a case that says that you have to give a specific instruction, no.  And that's not what I was saying.

I think in order to avoid the potential for a jury to convict based on anything other than penetration, when we are dealing with an object, it's appropriate for the Court to give—

THE COURT:  I'm sorry to cut you off.  Go ahead, finish.

MR. ZELMAN:  It's appropriate for the court to give an instruction so that the jury doesn't convict based on touching or touching of the labia, the clitoris, and it's solely penetration of the vagina, which is separate from the other—the clitoris, the labia that we've discussed.  I think that that's a significant issue.

THE COURT:  It certainly is an issue which I think that they have to show penetration.  But the evidence in this case and like I say, I don't have a child, I've got an adult who says my vagina was

penetrated, not just touched, whatever. I've got no testimony, no evidence that says I touched her in that area around her vagina or her clitoris or vulva, whatever else, I touched. I don't have any evidence of that at all.

MR. ZELMAN: I disagree. I think that Investigator Wilder, Sergeant Wilder's characterization of Mr. Martin's statement concerned the vaginal area and not the vagina, and I think that that's where the confusion comes in, and that's what we are concerned—

THE COURT: Vaginal area is not the—do you want me to say the vaginal area is not a vagina?

MR. ZELMAN: I think we need to define—

THE COURT: I could do that, I guess. I don't remember—I thought his testimony was that the Defendant said his hands were moving towards that area but never got there, that's what I thought I heard. But if there's some testimony of that, and you think the jury wouldn't be clear about it, I can say—and I think the State would agree that—maybe not—that the vaginal area is not the vagina. If you include the vaginal area, that, to me, means your pubic area—

MR. ZELMAN: Right.

THE COURT: —for lack of a better term.

MS. NORRIS: And, I mean, I guess the testimony they're referring to was Officer Wilder, and I think we quoted from the question and answer, was: were your hands moving towards her vagina? And the Defendant responded, towards that area, but something, something. So I mean, I—

THE COURT: So I'm thinking in terms of an argument that you can make, I don't think you can argue to the jury based on the evidence that, well, he may have touched her vagina, but he never penetrated it. Or he may have touched her vagina area and never touched it, because there's no evidence that he did, other than the victim. The victim says

he penetrated.  So it's not like well, you know, he was giving me a massage, and he got kind of close, and I think he penetrated.  Or he says I was giving her a massage, and it got a little close, but I never penetrated.  Then you would have, well, okay, well, maybe.  I'm even skeptical about that.  But—

MR. ZELLMAN:  Well, I certainly respect the Court's, you know, position.

(ECF No. 10-3 at 321 through 10-4 at 4).

The trial court gave Florida's standard jury instruction on sexual battery and attempt as follows, in relevant part:

To prove the crime of Sexual Battery when Victim Physically Helpless, the State must prove the following four elements beyond a reasonable doubt:

1.  MW was 12 years of age or older.

2.  Tyson Martin committed an act upon MW in which the finger of the Defendant penetrated her vagina.

3.  MW was physically helpless to resist.

And 4.  The act was committed without the consent of MW.
. . . .
The lesser crimes indicated in the definition of Sexual Battery when victim Physically Helpless are:  Sexual Battery, Attempted Sexual Battery when victim Physically Helpless, Attempted Sexual Battery, and Battery.
. . . .
To prove the crime of Attempted Sexual Battery When Victim Physically Helpless, the State must prove the following elements beyond a reasonable doubt:

1.  MW was 12 years of age older.

2.  Tyson Martin attempted to penetrate the victim—or the vagina of MW with his finger; however, he failed or was prevented from doing so.

And 3.  MW was physically helpless to resist.

4.  The act was committed without the consent of MW.

(ECF No. 10-4 at 24–26 (trial transcript)).  *See* Fla. Standard Jury Instructions in Crim. Cases, Part Two:  Instructions on Crimes, Chp. 11, § 11.3.

Martin presented Ground 4 to the First DCA on direct appeal (*see* ECF No. 10-4 at 208–12 (Martin's initial brief)).  He cited the Fifth and Fourteenth Amendments in support of his claim that the trial court's failure to give the special instruction denied his constitutional right to a fair trial, but he did not cite any Supreme Court case in support of his claim (*see id.*).  The First DCA affirmed the judgment without written opinion.  *Martin v. State*, 247 So. 3d 422 (Fla. 1st DCA 2018) (Table).

As in state court, Martin did not cite any Supreme Court decision in support of Ground 4 in his amended § 2254 petition (*see* ECF No. 5 at 25–28).  Martin's failure to identify a Supreme Court decision that addresses the specific question presented, let alone demonstrate that the First DCA's rejection of his federal claim was contrary to or an unreasonable application of that decision, provides grounds on which to deny federal habeas relief.

Further, although the Supreme Court has found certain jury instructions unconstitutional, the jury instruction at issue in Martin's case is not one of those.[9]

Moreover, Martin does not dispute that the instructions given to the jury were a correct statement of the law.  And although he appears to argue that the failure to define vagina and other parts of the female genitalia deprived the jury of the opportunity to adequately consider his theory of defense, that argument is not supported by the state court record.

Martin's theory of defense was that even though he put his hand down the back of M.W.'s shorts, touched her buttocks, and moved toward her vagina, he did not penetrate her vagina or intend to penetrate her vagina.  The standard jury instructions informed the jury that in order to be convicted of sexual battery, or attempted sexual battery, by the use of fingers, the State was required to prove that

---

[9] For example, the Supreme Court has repeatedly held that jury instructions imposing mandatory presumptions violate the defendant's due process rights, because they relieve the State of its burden to prove every element of the offense beyond a reasonable doubt.  *Carella v. California* 491 U.S. 263, 265–66 (1989); *Francis v. Franklin*, 471 U.S. 307 (1985); *Sandstrom v. Montana*, 442 U.S. 510 (1979).  Other cases involve the penalty phase in capital cases.  *See Mills v. Maryland*, 486 U.S. 367, 384 (1988) (holding that penalty phase jury instructions in a capital case are unconstitutional where they may lead the jury to believe they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular circumstance); *Beck v. Alabama*, 447 U.S. 625, 627 (1980) (holding that the death penalty may not be imposed when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict).

Martin penetrated M.W.'s vagina with his finger(s), or he attempted to penetrate her vagina with his finger(s), respectively.

At trial, there was no evidence that Martin touched or intended to touch any part of M.W.'s genitalia except her vagina. M.W. testified that she awoke with Martin's fingers "moving vigorously" inside her vagina (ECF No. 10-3 at 1–2 (M.W.'s trial testimony)). Martin told Investigator Wilder that his hand was headed toward M.W.'s vagina, but he did not penetrate her vagina or intend to touch her vagina (ECF No. 10-3 at 162, 187–88, 193 (Investigator Wilder's trial testimony)). Defense counsel asked Investigator Wilder if Martin admitted to trying to touch other parts of M.W.'s genitalia, i.e., her labia majora, labia minora, or clitoris, and Wilder responded that he did not ask Martin those questions (*id.* at 187–89). Investigator Wilder admitted that toward the end of his interview, he interchanged the terms "vagina" and "vaginal area" (*id*. at 178–79). However, on re-direct examination, Wilder testified as follows:

> Q. When you asked him [Martin] about where his fingers were traveling, did you ask him—did you use the phrase towards her "vaginal area" or her "vagina"?
>
> A. Vagina.
>
> Q. Was your specific question: Did your fingers ever make it to her vagina?
>
> A. Yes, ma'am, that was my question.

Q.  And what was his exact response?

A.  "No, they didn't.  They moved toward the area but no."

(ECF No. 10-3 at 196 (Investigator Wilder's trial testimony)).

If Martin's theory of defense had been that he touched or penetrated another part of M.W.'s genitalia besides her vagina, and if there was evidence adduced at trial that supported that theory, Martin may have had an argument that the failure to provide the jury with definitions of the relevant genitalia prevented the jury from adequately considering his defense.  But those were not the circumstances.

Martin has not demonstrated that the state court's adjudication of the fair trial claim presented in Ground 4 was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law. Therefore, he is not entitled to federal habeas relief on Ground 4.

### E.    "Ground 6:  Defense counsel rendered ineffective assistance of counsel by failing to investigate, research and prepare for trial."

Martin contends defense counsel was ineffective for failing to depose Investigator Wilder regarding his belief, based upon his conversation with Martin, as to whether Martin denied any intention to touch M.W.'s vagina (ECF No. 5 at 31–34).  Martin asserts that in addition to his interview with Investigator Wilder, he had a conversation with Wilder in the hallway immediately following his arrest.

Martin asserts during this conversation, Investigator Wilder explained the charge, and Martin told Wilder that he did not touch or intend to touch M.W.'s vagina. Martin asserts a female transport officer was also in the hallway and overheard the conversation. Martin acknowledges that Investigator Wilder testified that he did not recall any such conversation in the hallway.

Martin asserts if defense counsel had deposed Investigator Wilder, counsel could have identified and deposed the transport officer and then called her to testify. Martin also asserts that Wilder's deposition would have prepared defense counsel to recross-examine Wilder regarding Martin's statement regarding his intent.

The State concedes that Martin exhausted this IATC claim by presenting it in his Rule 3.850 motion and on appeal of the circuit court's denial of the motion (*see* ECF No. 10 at 49). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 50–52).

### 1. Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2. Federal Review of State Court Decision

Martin presented this IATC claim as Ground 3 of his Rule 3.850 motion (ECF No. 10-5 at 60–62). The state circuit court adjudicated the claim as follows:

The third claim is that counsel was ineffective for failing to depose Investigator Wilder and an unnamed transport officer. This claim is based on the defense contention that Investigator Wilder had an unrecorded conversation with defendant in the presence of an unnamed transport officer. However, Investigator Wilder clearly stated that his only conversation with the defendant was recorded. (Att. A, Trial Transcript excerpt, page 233, lines 13–14) No deposition would have changed this fact. So the sole defense contention is that a deposition of the unnamed transport officer might have resulted in a contradiction of the investigator's statement. This is pure speculation. It is particularly absurd since there exists an extensive recorded conversation of what the defendant actually said. The record refutes any alleged ineffective assistance of counsel and unfair prejudice to the defendant.

(ECF No. 10-5 at 101–02). The First DCA affirmed this decision without written opinion. *Martin v. State*, 297 So. 3d 525 (Fla. 1st DCA 2020) (Table).

The state court's factual finding regarding Investigator Wilder's testimony was reasonable. The trial transcript shows that Investigator Wilder testified as follows, in relevant part:

Q [by defense counsel]. Now, after Mr. Martin's interview was over and he was—you were leaving the room with him, did the two of you have a conversation?

A. I don't recall. The transport officer came and got him after the determination was made to arrest him, and I don't recall that I—I don't recall a conversation. I don't recall if he was escorted—if I escorted him down with the patrol unit or not.

Q. Did you have a conversation with him after the decision was made to arrest about what he said that caused you to arrest him?

A.  I did have a conversation with him after I notified him he was being arrested and we handcuffed him and sat him in the room that he was being interviewed in.  I do not recall the extent of that conversation.  Any conversation I had with him was recorded.

Q.  If it was in the room?

A.  If it was in the room, yes, sir.

Q.  So any conversation outside of that room would not have been recorded?

A.  Yeah.  But then again, I don't recall having a conversation with him in regards to this outside of the room.

Q.  The conversation you did have with him concerning why he was being arrested—I think I left the transcript up there.  Did you discuss with him why he was being arrested in the interview room?

A.  Yes, sir.

(ECF No. 10-3 at 183–84 (Investigator Wilder's trial testimony)).

Martin has not demonstrated that the adjudication of his claim was based upon an unreasonable determination of the facts.  As the state court found, Wilder specifically testified that any conversation with Martin was recorded.  Wilder also testified that he recalled no other (i.e., unrecorded) conversation.  Therefore, Martin has not satisfied § 2254(d)(2).

Additionally, Martin has not demonstrated that the state court's application of *Strickland*'s prejudice prong was unreasonable.  Martin proffered no factual basis to support his suggestion that Investigator Wilder's deposition would have produced

different or additional testimony regarding the alleged hallway conversation or Wilder's belief as to Martin's intention when he put his hand down M.W.'s shorts. Likewise, Martin proffered no factual basis for his suggestion that deposing Investigator Wilder would have led to the discovery of a transport officer who would have testified she heard Martin say he did not touch or intend to touch M.W.'s vagina. The state court reasonably characterized Martin's assertions as purely speculative and reasonably concluded that Martin failed to show prejudice under *Strickland*. Martin thus is not entitled to federal habeas relief on Ground 6.

### F.    "Ground 7:  The cumulative effect of the errors in this case deprived Petitioner Martin of a fair trial."

Martin asserts that all of the alleged errors committed in his case, considered either individually or together, resulted in his being denied a fair trial (ECF No. 5 at 34).

The State contends Martin's "cumulative effect" argument is not cognizable on federal habeas review (ECF No. 10 at 53). The State further argues that Martin did not demonstrate any individual errors in Grounds 1 through 6; therefore, there is no error to accumulate (*id.* at 53–54).

The "cumulative effect" or "cumulative error" doctrine provides that the aggregation of non-reversible errors "can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755

F.3d 1273, 1284 (11th Cir. 2014) (citing *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012)).  The federal court must first address the validity of each of the petitioner's claims individually and then examine any errors in the aggregate and in light of the trial as a whole.  *Id.*  Where there is no actual error, the cumulative-error claim has no merit.  *Insignares*, 755 F.3d at 1284 (citing *Morris*, 677 F.3d at 1132).

For the reasons discussed *supra* in Grounds 1 through 6, this court has found no actual error with respect to any of Martin's claims.  In the absence of any actual error, Martin's "cumulative effect" claim asserted in Ground 7 has no merit and should thus be denied.

## IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the amended petition for writ of habeas corpus (ECF No. 5) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 7<u>th</u> day of September 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**